**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **SETTLEMENT AGREEMENT** |
| | ) | |
| SPRINGFIELD POLICE DEPARTMENT | ) | |
| and CITY OF SPRINGFIELD, | ) | |
| | ) | |
| Defendants. | ) | |

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................... 4

II.     BACKGROUND ......................................................................................................... 4

III.    USE OF FORCE ......................................................................................................... 7

    A.      Use of Force Policies and Principles ........................................................... 7

    B.      Reporting, Investigating and Reviewing Force ......................................... 8

    C.      Level 1 Supervisor Response ...................................................................... 12

    D.      Level 2 Supervisor Response ...................................................................... 12

    E.      Level 3 and 4 Uses of Force ....................................................................... 13

    F.      Level 5 Uses of Force .................................................................................. 15

    G.      Use of Force Committee .............................................................................. 17

    H.      Use of Force Training .................................................................................. 18

IV.     ACCOUNTABILITY .............................................................................................. 19

    A.      Duties of Conduct and Reporting .............................................................. 19

    B.      Misconduct and Complaint Intake, Investigation, and Adjudication ................................. 20

        1.      Complaint Intake .............................................................................. 21

        2.      Process for Opening Investigations ................................................ 21

        3.      Investigation of Complaints ............................................................ 22

        4.      Resolution of Complaints ................................................................ 24

        5.      Training for Complaint Investigation ............................................ 27

        6.      Board of Police Commissioners ...................................................... 27

        7.      Discipline ........................................................................................... 30

V.      TRANSPARENCY AND INTERNAL OVERSIGHT ......................................... 31

    A.      Data Collection and Analysis ..................................................................... 31

VI.     TRAINING ............................................................................................................... 34

    A.      Training Plan ................................................................................................ 34

    B.      Field Training Program .............................................................................. 34

    C.      Training Development and Administration ............................................... 35

    D.      Documentation of Training ......................................................................... 35

VII.    SUPERVISION ........................................................................................................ 36

    A.      Duties and Training of First Line Supervisors ........................................ 36

    B.      Early Intervention System .......................................................................... 37

    C.      Performance Evaluations and Assignments .............................................. 39

    D.      Officer Wellness ........................................................................................... 40

**VIII.   BODY WORN CAMERAS**................................................................................................40

**IX.     POLICIES, PROCEDURES, AND PROTOCOLS**...........................................................41

**X.      IMPLEMENTATION, ASSESSMENT, OUTCOMES, AND ENFORCEMENT** ...............42

   **A.**   **Role of the Independent Compliance Evaluator** ......................................................42

   **B.**   **Selection and Compensation of the Compliance Evaluator** .....................................42

   **C.**   **Responsibilities of the Compliance Evaluator** ........................................................44

      **1.**   **Compliance Evaluator Plan** .................................................................................45

      **2.**   **Audits**..................................................................................................................45

      **3.**   **Outcome Measurements**......................................................................................46

      **4.**   **Compliance Evaluator Recommendations and Technical Assistance**...................50

   **D.**   **Compliance Evaluator Reports**..............................................................................51

   **E.**   **Communication between Compliance Evaluator, Parties, and Public** ......................52

   **F.**   **Public Engagement** ................................................................................................52

   **G.**   **Transparency Regarding Efforts to Address Misconduct**........................................55

   **H.**   **Public Statements, Testimony, Records, and Conflicts of Interest**...........................55

   **I.**   **SPD Settlement Agreement Implementation Unit** ...................................................56

   **J.**   **SPD Self Assessments and Reporting**.....................................................................56

   **K.**   **Access and Confidentiality** ....................................................................................57

   **L.**   **Court Jurisdiction, Modification of this Agreement, and Enforcement** ...................58

   **M.**   **Termination of this Agreement** ..............................................................................60

**XI.     DEFINITIONS AND ABBREVIATIONS**.......................................................................62

## I.     INTRODUCTION

1.     The United States of America and the City of Springfield, MA (collectively, "Parties") are committed to ensuring that police services in Springfield are delivered by the Firearms Investigation Unit (formerly known as the Narcotics Bureau) officers in a manner that is constitutional and effective at protecting the public and officers alike. To further these goals, the City agrees to fully implement the terms of this Agreement, including by improving the Springfield Police Department's ("SPD") force policies and reporting practices; increasing accountability; providing officers with appropriate training; and increasing transparency.

## II.    BACKGROUND

2.     On April 13, 2018, the United States Department of Justice ("DOJ") initiated an investigation into SPD's policies and practices to determine whether SPD's Narcotics Bureau engages in a pattern or practice of unreasonable force in violation of the Fourth Amendment of the United States Constitution and the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601 ("Section 12601").

3.     As part of its investigation, DOJ conducted a comprehensive assessment of officers' use of force and related systems; policies and procedures; training; accountability mechanisms, and other SPD systems and records spanning 2013-2018.

4.     The City and SPD cooperated during the investigation and provided access to documents, facilities, and personnel.  Springfield's community advocates, religious leaders, and officials with SPD's patrol officer and supervisor unions, took an active interest in the investigation and played a critical role in providing information and facilitating a thorough investigation.

5.     On July 8, 2020, DOJ announced that it had reasonable cause to believe that SPD's Narcotics Bureau engaged in a pattern or practice of using unreasonable force, and that systemic deficiencies in SPD's policies, accountability systems, and training contributed to the pattern or practice of unreasonable force.

6.     The Narcotics Bureau was a small unit of SPD plainclothes officers tasked with enforcing drug-related laws.  Based on current crime trends and patterns, and to readjust the allocation of resources to both meet the needs of the Springfield community and target enforcement priorities on reducing gun violence, on July 8, 2021, the Springfield Police

Commissioner announced that there would no longer be a unit within the SPD whose exclusive focus was enforcing drug-related laws.  Rather all of the officers, who were focused on drug related offenses will be reassigned to a newly created Firearms Investigation Unit ("FIU").  One officer will also be assigned to work with the Hampden County District Attorney's Strategic Action and Focused Enforcement Unit, although this is not expected to be a full-time assignment.   Another officer will be assigned to work with the U.S. Marshal's Violent Fugitives task force.  The task forces mentioned, which are multi-jurisdictional, will continue to be focused on drug-related laws.

7.      The City agrees that DOJ's findings raise issues of importance to the City that should be addressed.

8.      The City further agrees that this Agreement applies to the Narcotics Bureau and its successor, the newly-created FIU, and any following successors that may later form.

9.      On February 22, 2022, the Supreme Judicial Court of Massachusetts ruled that Sections 67-84 to 67-96 of the Springfield Municipal Code obliges the City to establish a five-member civilian police commission to oversee SPD.[1]  The City is in the process of implementing this new civilian police commission.  To the best of the parties' abilities, the anticipated changes have been referenced herein.  The Parties do not intend this Agreement to alter or override existing local ordinances regarding the structure or management of the Springfield Police Department.  As the City establishes the police commission, the Parties will confer in good faith regarding any changes, modifications, or amendments to the Agreement that may be advisable to ensure that the goals of the Agreement can be achieved under the police commission structure. The Parties shall abide by Paragraph 236 in seeking any changes, modifications, or amendments to the Agreement.

10.     This Agreement was reached as a result of the authority granted to the Department of Justice under Section 12601 to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges, or immunities secured by the Constitution or federal law.

11.     The City and DOJ have worked together cooperatively to develop this Agreement.

12.     The City and SPD are, by and through their officials, officers, employees, agents, assigns, or successors, are enjoined from engaging in a pattern or practice of conduct by SPD

---

[1]      *City Council of Springfield v. Mayor of Springfield*, No. 13154 (Mass. Feb. 22, 2022).

Narcotics Bureau officers that constitutes unreasonable force under the Fourth Amendment to the Constitution.

13.     To ensure constitutionality regarding use of force and consistency across the Department, the City and SPD agree to implement the provisions of this Agreement throughout the Department unless a provision specifies that it applies only to the Narcotics Bureau or the FIU.   There has been no finding of a pattern and practice of unconstitutional use of force within the SPD beyond the Narcotics Bureau, but the City, SPD and the DOJ agree that systemic changes in areas such as training and/or reporting practices further the shared goals of increasing accountability; providing officers with appropriate training; and increasing transparency.

14.     This Agreement will constitute the entire integrated agreement of the Parties.  No prior drafts or prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

15.     This Agreement is binding upon all Parties hereto, by and through their officials, agents, employees, and successors.

16.     This Agreement is not intended to limit or expand the right of any person or organization to seek relief against the City, SPD, or any officer or employee thereof, for their conduct or the conduct of SPD officers; accordingly, it does not alter legal standards governing any such claims by third parties, including those arising from city, state, or federal law.  The Department of Justice does not serve as a tribunal authorized to make factual findings and legal conclusions binding on, or admissible in, any court, and nothing in this Agreement should be construed as such. Accordingly, this Agreement is not intended to be admissible evidence in any matter brought by any person or entity not a party to the Agreement and does not create any legal rights or obligations.

17.     The City is responsible for providing necessary support and resources to SPD to enable SPD to fulfill its obligations under this Agreement, and as otherwise necessary to ensure that the requirements of this Agreement are fully implemented and sustained.

18.     In the interest of avoiding costly and protracted litigation, DOJ and the City agree to entry of this Agreement as an order of the Court.

III.     USE OF FORCE

19.     The City and SPD agree to continually revise their current force policies, training, reporting, and review mechanisms to ensure that SPD officers only use force in a manner consistent with the Constitution and laws of the United States, and the requirements of the Agreement, and that any unreasonable uses of force are identified and responded to appropriately.  These policies shall be developed and implemented within six months of the Effective Date.

A.     **Use of Force Policies and Principles**

20.     When possible, SPD officers shall use advisements, warnings, and verbal persuasion, before resorting to force; including identifying themselves as SPD officers before using force and, where practicable, giving individuals an opportunity to comply with verbal commands before using force.  This opportunity should be given when such delay will not compromise the safety of the officer or another, and will not result in the destruction of evidence, escape of a suspect, or commission of a crime.

21.     SPD will ensure that if force becomes necessary, all officers of the Springfield Police Department will use only the amount of force necessary to accomplish lawful objectives and will de-escalate at the point the threat diminishes.

22.     SPD's foot pursuit policy will provide guidance on the circumstances that may warrant engaging in a foot pursuit and the tactics officers should use to avoid the use of unreasonable force during or at the conclusion of a foot pursuit, and to keep members of the public and officers safe.

23.     SPD officers will not use force against handcuffed or otherwise restrained subjects unless necessary or reasonable under the circumstances to stop an assault, escape, or as necessary to fulfill other legitimate law enforcement objectives.

24.     SPD shall explicitly prohibit the use of force for punishment, including that officers shall not use force, including fist strikes to the head, to punish individuals for fleeing, resisting arrest, or assaulting an officer.

25.     SPD does not, and will not in the future, train its officers in the use of chokeholds and/or neckholds. SPD will prohibit the use of chokeholds or and/or neck holds unless deadly force is authorized, and no reasonable force alternative exists that is within SPD policy.

26.     SPD will revise its use of force policy to emphasize that any hard strike to the head with any impact weapon, such as a flashlight, or baton, is prohibited unless deadly force is justified.

27.     SPD acknowledges concerns about the use of head strikes and agrees to report and fully investigate these uses of force and impose discipline where warranted.  SPD will prohibit the reckless striking of an individual's head against a hard, fixed object (e.g., sidewalk, wall, jail bars, etc.).  SPD will prohibit the deliberate striking of an individual's head against a hard, fixed object, unless deadly force is authorized, and no other reasonable alternative is available.

28.     SPD agrees to prohibit vehicle pursuits, except where an officer obtains express supervisory approval, and the officer and supervisor have considered multiple factors and determined that the immediate danger to the public created by the pursuit is less than the immediate or potential danger to the public should the suspect remain at large.

29.     After any level of force is used, or any officer becomes aware of an injury to a person, the officer(s) involved shall immediately evaluate the need for medical attention. If needed, medical attention will be immediately provided or arranged as soon as the situation safely allows. The officer shall notify their immediate supervisor as soon as possible when a use of force has resulted in injury or medical treatment is requested, and about the circumstances necessitating the injury and/or need for treatment.

30.     SPD will revise its policies as needed to ensure they put officers on notice that the use of unreasonable force will be subjected to corrective action, discipline, possible criminal prosecution, and/or possible civil liability.

31.     SPD will require an officer present and observing another officer using physical force, including deadly force, beyond that which is necessary or objectively reasonable based on the totality of the circumstances, to intervene to prevent the use of unreasonable force. Failing to intervene shall be subject to appropriate departmental disciplinary action.

**B.      Reporting, Investigating and Reviewing Force**

32.     To ensure that officers use force only as permitted by law, policy, and this Agreement, and to enable SPD to hold officers accountable for unauthorized uses of force, and to correct training, tactical, and officer safety concerns, the City and SPD agree to develop

comprehensive reporting protocols that implement the following use-of-force reporting requirements.

### 1.   General Reporting Requirements Applicable to All Sworn Personnel

33.   SPD will ensure that officers accurately, thoroughly, and timely report all uses of force.

34.   For all uses of force (i.e., any force above unresisted handcuffing), the officers using force will be required to immediately report the use of force to an appropriate supervisor. The uninvolved supervisor will review the report to ensure all proper procedures were met. The uninvolved supervisor will then notify the Squad Commander by the end of the shift during which the force occurred. The notification will contain basic information concerning the incident.

35.   In addition to immediately notifying a supervisor, an officer using force will document the force in writing before the end of the shift.  In reporting uses of force, officers will provide a narrative that explains with specificity the type of force used, including(a) justification for each use of force (e.g. each punch); (b) the reason for the initial police presence and the legitimate police objective necessitating the use of force; (c) details regarding the level of resistance encountered; and (d) all efforts to de-escalate the situation to avoid the use of force and to minimize the level of force used, or reason why such de-escalation efforts were not attempted. Notwithstanding this requirement, the Parties recognize the inherent limitations on perception and recall following tense and rapidly evolving circumstances.  Further, the documentation of use of force must be done by each officer without conferring or discussing the matter with other officers.  Officers will note in their use-of-force reports the existence of any body-worn camera or other video footage, regardless of source.

36.   A single form, or use of force report, should be used to report all incidents of force (including punches and kicks), regardless of the type of force used.  This use-of-force report shall take the place of all of SPD's current use of force reporting forms, including the Prisoner Injury Report Narrative, OC report, taser report, and hot pursuit forms, the content of which will be incorporated into the single use of force reporting form. Nothing in this paragraph changes the obligation to follow internal policies and Massachusetts Law regarding filing "injury to prisoner reports," or any other similar state requirements, whether the injury is alleged to be as

9

a result of police conduct or not.  A use of force packet may contain multiple documents, including an "injury to prisoner report."

37.    Use-of-force reports shall be maintained centrally in the Records Management System and be searchable electronically.  The city and SPD shall develop this electronic database within 18 months of the Effective Date.

38.    SPD will ensure that officers do not use conclusory statements, boilerplate, or canned language (e.g., "violent struggle" or "only reasonable and necessary force was used") without providing supporting incident-specific detail in their use of force reports.

### 2.    General Supervisory Response Requirements

39.    SPD will require every officer who observes a use of force to complete a use of force report by the end of their shift if possible, and no later than the subsequent shift.

40.    If an officer who has observed a use of force by another officer has a reasonable belief that there has been a failure to report the use of force, they will immediately report the use of force, and the failure to report such use of force, to IIU and the Superintendent's office.

41.    Consistent with the Massachusetts General Law Chapter 276 process, the booking sergeant will ensure that there are photographs of prisoners' injuries.  If a prisoner is injured or alleges that an officer used unreasonable force, the booking sergeant shall gather as much information as possible from the prisoner about the circumstances surrounding the use of force, including, for example, which officer used force, what kind of force was used, and the circumstances that led up to the use of force.  If the force as alleged was a Level 3, 4, or 5 use of force, or any level of force which necessitates medical attention at a local hospital, the booking sergeant shall ensure that the appropriate personnel conduct an investigation of the force used. The booking sergeant shall additionally report all complaints of unreasonable uses of force to the Internal Investigations Unit ("IIU") and to the Superintendent's office. The booking sergeant need not interview the subject if they have already been interviewed by someone else, including a Force Investigation Team ("FIT")-trained supervisor.

42.    Notwithstanding the obligations set out herein, there may be times when public safety and police resources prevent the investigation from occurring at the scene at the time of the use of force.  All investigations of use of force must be done in such a manner that protects public and officer safety, including securing the scene, collection of evidence, and allowing for transport of any individual in need of medical attention. Witnesses and evidence relating to use

10

of force investigations may be duplicative of information and evidence being compiled by the Detective Bureau or outside law enforcement agencies for the underlying criminal investigation, and it is expected that access to witnesses and evidence will be coordinated between investigators.  When the investigation is unable to be completed at the scene, the supervisor will: (1) admonish all officers and SPD personnel against conferring with each other regarding the use of force prior to their interview;  (2) instruct that all body worn camera footage or other video or photographic evidence be flagged for retention; and (3) document the reason(s) justifying the need to delay the investigation (e.g., serious crime in another part of the City leaving insufficient personnel to investigate that night.)

43.    As set forth below, supervisors will report to and manage the scene upon being notified of a Level 3, 4, or 5 use of force.

44.    Whenever a supervisor uses, directs, or is otherwise personally involved in any type of force, the investigation will be conducted by a supervisor uninvolved, at a higher rank than the officer who used the force.

45.    SPD will ensure that Level 2, 3, 4, and 5 uses of force are appropriately and thoroughly reviewed to identify unlawful conduct, policy violations, and tactical needs.  Every supervisor in the chain of command is responsible for the accuracy and completeness of the use of force review completed by supervisors, and for initiating corrective action if necessary. SPD will ensure that whenever a supervisor uses, directs, or is otherwise personally involved in any type of use of force, including participating in the tactical planning that led to the use of force, an uninvolved supervisor, of a higher rank, who was not involved in the incident will review the use of force.  The Superintendent or his/her designee may, in their discretion, reassign a review of force of any level to a FIT-trained supervisor.

46.    When a supervisor has any questions or concerns regarding the findings of the use of force review (including any concerns that the findings are not supported by a preponderance of the evidence), the supervisor will recommend changes to the findings after consultation with the investigating supervisor and the previous reviewer and document the specific evidence or analysis supporting the modification.

47.    If a supervisor determines that an officer's report reveals evidence of misconduct or potential criminal conduct, including material omissions or inaccuracies, and/or coordination with other officers when writing the use of force report, SPD will take corrective action,

including notifying IIU and the Superintendent.  If the misconduct or evidence reveals conduct that is criminal in nature, the Superintendent will direct that the Detective Bureau investigate the criminal matter and notify the appropriate prosecutorial authority.

>### 3.      Level-Specific Response Requirements

48.      SPD will categorize force into the levels as outlined in the MPTC Use of Force model[2] for the purposes of reporting and reviewing each use of force. These levels are based on the following factors: potential of the technique or weapon to cause injury or disability; degree of actual injury or disability; duration of force; potential for abuse or misuse of weapon or force; and physical vulnerability of the subject. Each Level of force, as defined below, will require increasingly rigorous reporting, investigation, and review.

49.      When an incident involves multiple types of force or multiple officers, the entire incident will be reported and investigated at the highest level of force used by any officer during the incident.

>### C.      Level 1 Supervisor Response

50.      Based on the MPTC use of force continuum, a Level 1 use of cooperative control tactics with a non-resistant subject, such as unresisted handcuffing, does not constitute a use of force.

>### D.      Level 2 Supervisor Response

51.      A supervisor may respond to the scene upon notification of a Level 2 use of force but responding to the scene is not mandatory.

52.      Level 2 uses of force will be reviewed by an uninvolved supervisor of the same rank or above of the involved officer.

53.      A supervisor of the officer(s) employing a Level 2 use of force will review and document approval of a Level 2 force, and/or reclassify the use of force as a Level 3, 4, or 5 force before the end of the shift during which the force was used and no later than the subsequent shift.

---

[2] These categories of force generally correspond to the five levels of force that all officers are trained in by the SPD and as required by the Massachusetts Police Training Commission (MPTC).  In contrast to the MPTC use of force continuum, the levels of force described in this agreement only relate to an officer's actions, and not a subject's resistance.

54.     The first commander in the chain of command who reviews the uninvolved supervisor's use of force review of Level 2 force will ensure that the review is thorough, complete, makes the necessary and appropriate findings of whether the use of force was consistent with SPD policy; and whether there are tactical, equipment, or policy considerations that need to be addressed.  The involved officer's sergeant will ordinarily be the final reviewer of Level 2 uses of force.

55.     SPD will provide comprehensive training to supervisors about proper force investigation of Level 2 force.  This training shall be provided upon promotion to a supervisory role and incorporated into annual supervisor training.  The training shall include instruction in appropriate classification of force incidents as Level 2, 3, 4, or 5, conducting investigations, objectively analyzing evidence, and discipline, under the provisions set forth in this Agreement.

### E.     Level 3 and 4 Uses of Force

56.     Upon notification of a Level 3 or 4 use of force, an uninvolved supervisor of the officer(s) using force will respond to the scene.

57.     SPD will ensure that upon arrival at the scene, the uninvolved supervisor will identify and collect information sufficient to establish the material facts related to the Level 3 or 4 use of force, including the following information:

    a.  Locate relevant civilian witnesses including the subject and third parties and arrange for those witnesses to be interviewed. Interviewing of witnesses will be coordinated with the Detective Bureau officers as set out in paragraph 42 herein. Witnesses need not be interviewed at the scene, but sufficient information to allow identifying and contacting witnesses should be gathered;

    b.  Use Department-issued equipment to record interviews with civilian witnesses, including a civilian's refusal to be interviewed;

    c.  Separate all officers involved in a Level 3 or 4 use of force incident until interviewed, or if that is not possible, admonish them to not discuss the matter with other officers;

    d.  "Officers involved" for this paragraph shall mean the officer(s) who actually used the force.  Group interviews will be prohibited. Supervisors will not ask officers or other witnesses leading questions that suggest legal justifications for the

13

officers' conduct.  All officers who use Level 3 or 4 force will be asked to provide an oral use of force statement in person to the uninvolved supervisor;

e.  Review and flag for retention any body-worn camera footage capturing any part of the use of force incident;

f.  Canvass the area for any CCTV or other surveillance cameras in the area, document their locations, and attempt to obtain video voluntarily and review the footage;

g.  Photograph or arrange to have photographed the scene and location of the incident and identify relevant evidence to be collected if not collected by the supervisor, such as forensic evidence; and

h.  Photograph or arrange to have photographed the subject for identification purposes and all injuries or claims of injury to anyone involved and denote the lack of injury when applicable.

58.  All Level 3 and 4 uses of force will be thoroughly reviewed by an uninvolved supervisor above the rank of the involved officer.  The supervisor conducting the use of force review will evaluate in writing all uses of force for compliance with SPD policy, as well as any other relevant concerns (e.g., tactical or threat assessment). The supervisor should provide timely, constructive feedback, where appropriate

59.  The uninvolved supervisor's use of force review will be completed within 72 hours of the Level 3 and 4 use of force, unless the supervisor's commanding officer approves an extension.  The completed use of force review will include documentation of the following:

a.  A detailed narrative description of the incident;

b.  The supervisor's actions in reviewing or screening the incident;

c.  Documentation of all evidence that was gathered; and

d.  A review of the incident, including a discussion and resolution of any material inconsistencies in the evidence; whether the force used was necessary, proportional, and objectively reasonable, and otherwise within SPD policy.

60.  For force reviews involving Level 3 and 4 uses of force, the Squad Commander/Watch Commander in the officer's chain of command is the reviewing supervisor. After the Captain completes the assessment of a Level 3 and 4 use of force, the file will be forwarded to the Use of Force Committee ("UFC").

61.     At the discretion of the officer's chain of command, or the UFC, a use of force may be assigned or re-assigned for investigation to a FIT-trained supervisor, if warranted.

**F.     Level 5 Uses of Force**

62.     Upon notification of a Level 5 use of force, an uninvolved supervisor will respond to the scene.  The on-scene uninvolved supervisor shall take initial steps in response to the incident consistent with the requirements for Level 2, 3, and 4 use of force incidents in Paragraphs 53 and 57 until turning the scene over to a FIT-trained supervisor.

63.     SPD will ensure that a FIT-trained supervisor will respond to and investigate all Level 5 use of force incidents; and any other incident as deemed appropriate by the Police Superintendent or their designee.

64.     To guide FIT practices and investigations, within one year of the Effective Date, SPD will develop and implement a FIT training curriculum and procedural manual.  The manual shall address the coordination of efforts between the Detective Bureau, or other SPD personnel, and FIT-trained supervisors regarding the collection of evidence, witness interviews, and any other investigative duties.  The manual shall also make clear that Detective Bureau investigators will have priority access to witnesses and evidence at the scene. Within eighteen months of the Effective Date, SPD will train selected supervisors and other personnel on the manual and related FIT procedures.

65.     FIT will consist of supervisor level personnel who undergo the training enumerated in Paragraph 64, above.  The member of this team will investigate use of force incidents as set out herein.  It is not expected that FIT investigations will comprise any supervisor's full-time work.  Rather, these supervisors will collectively be responsible for discharging the obligations relative to use of force investigations as set out herein.

66.     The FIT-trained supervisor who responds to the use of force will lead all investigative activity regarding the use of force, which includes locating and interviewing witnesses, securing the scene and evidence, locating video surveillance that may have captured the incident, and making notifications.  The FIT-trained supervisor will work cooperatively with any other department or division or outside personnel investigating underlying criminal activity at the scene, whether such criminal activity relates to the SPD officer's use of force or not, and will make every effort to avoid activities which compromise, impede, or otherwise disrupt the criminal investigation at the scene of the use of force.

15

67.     FIT will have the following responsibilities in responding to a Level 5 use of force incident subject to the provisions of paragraph 42 contained herein:

a.  FIT-trained supervisor will assume control of the use of force investigation upon their arrival;

b.  FIT-trained supervisor will record all interviews with civilian witnesses.  If a civilian witness refuses to be recorded, the FIT-trained supervisor will document the refusal and take a written statement from the witness.  If recorded interviews of witnesses are being done by other SPD personnel, the FIT-trained supervisor will have access to such interview recordings and can rely on those to lessen the number of interviews a witness is subjected to;

c.  FIT-trained supervisor will ensure that the Shift Commander has separated all officers involved in, or who witnessed, a use of force incident until they are all interviewed; If it is not possible to separate all officers until they can be interviewed, they will be admonished to not confer, discuss or review the use of force incident with others until they are able to be interviewed;

d.  FIT-trained supervisor will ensure all video evidence is immediately gathered and assessed; this obligation can be discharged by assuring that other SPD personnel have secured this evidence;

e.  The FIT-trained supervisor will arrange for a crime lab technician to process the scene and provide photos as soon as practicable to FIT; this obligation can be discharged by assuring that other SPD personnel have secured this evidence;

f.  FIT-trained supervisor will attempt to interview the person upon whom the officer used the Level 5 use of force to obtain the person's account of what happened, if possible, as an audio-recorded interview.  They will also photograph or arrange to have photographed areas of injury or complaint of injury; this obligation can be discharged by assuring that other SPD personnel have secured this evidence;

g.  The FIT-trained supervisor responding to the scene will review body-worn camera or other video which may have recorded all or part of the incident and describe in the force report what the video shows; this need not be done at the scene but within a reasonable time thereafter;

h.  FIT-trained supervisor will seek to obtain voluntary statements from all involved

16

officers.  All interviews with officers must be recorded (audio and/or video) and take place as soon as practical.  To the extent this requires modification to various involved union contracts, the City agrees to make due and diligent efforts to negotiate such modifications in accordance with this paragraph;

i.  The FIT-trained supervisor responding to the scene will arrange for the involved officers to submit use of force written reports as soon as practicable and no later than 24 hours after the incident, except in extenuating circumstances, such as when an officer is injured, in which case the officer will submit their written report as soon as the extenuating circumstance allows;

j.  FIT-trained supervisor will be responsible for notifying the involved officer's commanding officer, the Police Superintendent, and Deputy Chiefs no later than 24 hours after learning of the Level 5 use of force, unless impractical. This notification will contain basic facts about the incident as they are known at the time;

k.  FIT-trained supervisor will complete their investigation within 60 days or as soon as possible thereafter; and

l.  If the FIT-trained supervisor uncovers potential administrative misconduct at any point in the investigation, the FIT-trained supervisor will notify the Captain of IIU and the Superintendent's office.  If FIT uncovers potential criminal conduct at any point in the investigation, the FIT-trained independent supervisor will notify the Superintendent's office who will in turn authorize notifying the appropriate prosecuting authority and providing all relevant information.

**G.    Use of Force Committee**

68.    The Use of Force Committee (UFC) will conduct timely, comprehensive, and reliable reviews of all Level 2, 3, 4, and 5 uses of force.  The UFC will be formed and meet at least two times within one year of the Effective Date.

69.    Within one year of the Effective Date, the UFC will develop procedures, outlined in a manual, to govern its operations.

70.    The UFC will consist of a Deputy Chief or their designee, who is either another Deputy Chief or Captain (who will chair the Committee); a supervisor from the Training Division; one representative from each involved squad; and one representative from the Board of

Police Commissioners.  The Chair may include any subject matter experts the Chair believes would be helpful in reviewing particular incidents.

71.    Within one year of the Effective Date, and annually thereafter, each UFC member will receive a minimum of eight hours of training, including training on legal updates regarding use of force and curriculum utilized by the Training Division regarding use of force.

72.    The UFC will review each use of force to confirm that the findings from the chain of command are consistent with law and policy and supported by a preponderance of the evidence, to determine that the investigation is thorough and complete, and to identify any patterns in tactical, equipment, or policy considerations that need to be addressed through policy and/or training modifications.  Should policy, equipment, or training deficiencies be noted in the review process, the UFC Chair will ensure that they are brought to the attention of the relevant commanding officer for appropriate action.

73.    The UFC will not make recommendations concerning discipline or misconduct. However, the Chair of the UFC shall make a referral to IIU and the Superintendent's office if potential misconduct not previously investigated is discovered in the review process.

**H.  Use of Force Training**

74.    As part of its training requirements in Section VI of this Agreement, and in addition to its firearms training, within one year of the Effective Date, SPD will provide eight hours of use of force training that is adequate in quality, quantity, scope, and type and that includes:

a.  Proper use of force decision-making under a critical thinking, decision-making model that requires officers to gather relevant facts about the incident; assess the situation, threats, and risks; consider police powers and SPD policy; identify options and determine the best course of action; act, review, and re-assess the situation;

b.  Use of force reporting requirements, including how to write clear and detailed reports;

c.  The Fourth Amendment and related law;

d.  Appropriate de-escalation techniques, both verbal and tactical, that minimize the need to use force and empower officers to make arrests without using force;

e.  Role-playing scenarios and interactive exercises that illustrate proper use of force decision making, including training on the importance of peer intervention;

f.  Proper use of head strikes, including instruction that a strike to the head could result in death or serious injury, head strikes are permitted only when a subject is assaultive, and that any strikes to the head should be consistent with policy and training and must not be used as the first method of trying to gain compliance;

g.  Importance of avoiding kicks to suspects;

h.  Proper way to conduct takedowns; and

i.  The circumstances that may warrant initiating or continuing a vehicle or foot pursuit and appropriate tactics to avoid the use of unreasonable force during or at the conclusion of a vehicle or foot pursuit.

75.   SPD also will provide the use of force training described above to all new officers as part of its training Academy.

76.   Within 30 days of their assignment to the Firearms Investigations Unit ("FIU"), SPD will also provide FIU officers with four hours of training that focuses on the circumstances encountered by FIU officers given their particularized assignment, and available tactics for avoiding unnecessary uses of force in those encounters.

## IV.   ACCOUNTABILITY

77.   The City will ensure that SPD's accountability systems are effective, fair, and transparent, and function to appropriately identify and respond to misconduct.

### A.   Duties of Conduct and Reporting

78.   Within 120 days of the Effective Date, SPD will review applicable policies and personnel regulations to ensure incorporation of the principles enumerated in Paragraphs 33-47 to which employees must adhere.

79.   Anyone who violates the policies that SPD puts in place as a result of this settlement agreement, including of provisions relating to the principles of accountability, shall be subject to appropriate discipline.

80.   SPD will require that every sworn officer, regardless of rank, who observes or becomes aware of any act of misconduct by another sworn officer against a member of the public report the incident to a supervisor for appropriate documentation and investigation.

81.     SPD will require that every sworn officer, regardless of rank, be truthful at all times in spoken, written, or electronic communications, whether under oath or not, in all matters and official investigations relating to the scope of their employment.  This requirement shall be incorporated into SPD policy within six months of the Effective Date.

82.     SPD will require all SPD officers to wear nameplates or nametags as part of the standard uniform that will allow members of the public to identify officers with whom they interact.  This shall be completed within six months of the Effective Date. To the extent this requires modification to various involved union contracts, the City agrees to make due and diligent efforts to negotiate such modifications in accordance with this paragraph. SPD supervisors will be required to inspect personnel at roll call prior to shifts to ensure that officers under their command are complying with this requirement.

83.     SPD officers shall provide their names and badge numbers to members of the public upon request.

84.     SPD will require sworn officers to cooperate with administrative investigations to the fullest extent permitted by law, including appearing for an interview when requested and providing all requested documents and evidence.

85.     SPD will expressly prohibit all forms of retaliation, including discouragement, intimidation, coercion, or adverse action, against any person—civilian or employee—who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct.

**B.     Misconduct and Complaint Intake, Investigation, and Adjudication**

86.     SPD will develop and implement policies to ensure that all allegations of misconduct are courteously received, centrally documented and tracked, and fully and fairly investigated as required by this agreement. These policies will include the requirements set out below and be developed within six months of the Effective Date.

87.     Within nine months of appointment of the IIU Attorney referenced in paragraph 89, SPD will develop a manual for IIU that sets forth in detail how officers will classify and investigate allegations of misconduct.

88.     A command officer with experience and expertise in investigating officer misconduct and supervision of such investigations shall lead IIU.

89.     No later than 90 days after the Effective Date, SPD will appoint an attorney ("IIU Attorney") who is not a sworn officer to work alongside the head of IIU.  In coordination with the IIU head, the IIU Attorney shall ensure that complaints are properly classified, and investigations are thoroughly conducted and properly documented.  The IIU Attorney will assist IIU in analyzing facts, making credibility determinations, and making recommendations for findings.

   a.  The IIU Attorney does not act as an attorney for IIU but instead will work with the IIU head to help bolster the quality of IIU's work to promote effective accountability and transparency.

   b.  One year following the appointment of the IIU Attorney, the parties shall meet and confer on initial implementation and discuss any changes that should be made to the IIU Attorney's role or responsibilities.

   **1.      Complaint Intake**

90.     Within six months of the Effective Date, SPD shall make complaint forms and informational materials regarding the citizen complaint process, including brochures and posters, available as appropriate in Springfield, including, at a minimum, at SPD stations, courts, local libraries, and SPD's website, and make them available to individuals and community groups upon request.

91.     SPD will accept all complaints about the conduct of its officers, including anonymous and third-party complaints, for review and investigation.  The refusal to accept a personnel complaint, discouraging the filing of a complaint, or providing false or misleading information about filing a complaint, shall be considered misconduct. Complaints may be made in writing or orally, in person or by mail, telephone (or TDD), facsimile, or electronic mail, as well as in the field or to a booking sergeant.  Any Limited English Proficient (LEP) individual who wishes to file a complaint about an SPD officer shall be provided with a complaint form and informational materials in the appropriate non-English language and/or be provided appropriate translation services in order to file a complaint.

   **2.      Process for Opening Investigations**

92.     When IIU receives a complaint alleging officer misconduct, IIU shall immediately notify the Superintendent.  When the Superintendent receives a complaint or report alleging officer misconduct, the Superintendent shall immediately notify IIU.

93.     Upon receipt of any complaint or referral, IIU shall administratively open a case for tracking purposes.

94.     Working with the IIU Attorney, IIU will then recommend, in writing, a classification for the complaint or internal referral  using one of the following categories: (1) Special Orders (SOs), which are performed in more serious cases and handled by IIU investigators, all of whom hold the rank of sergeant or higher, (2) Preliminary Investigations of Employees (PIEs), which are handled by supervisory officers but tracked by IIU, and (3) Administrative Inquiries (AIs), which are complaints that do not allege misconduct, handled by supervisory officers, but are still tracked by IIU.

95.     SPD will develop an appropriate policy for classifying complaints that ensures that misconduct complaints involving any allegation related to a use of force are classified as SOs and investigated by IIU.

96.     Following classification, IIU and the IIU Attorney will determine whether to recommend opening an investigation.

97.     The Superintendent will review IIU's recommendations regarding classification and investigation, make a final decision, and, where applicable, issue a SO.  If the Superintendent determines not to investigate an allegation of a use of force or decides to delay an investigation of an allegation of use of force, the Superintendent shall document the reasons for that decision in the file and immediately provide the file to the Compliance Evaluator.

### 3.     Investigation of Complaints

98.     IIU will continue to be in a separate location from SPD headquarters.

99.     SPD shall provide sufficient resources and qualified staff to IIU to ensure it can implement the provisions of this Agreement.

100.     All investigations of SPD misconduct complaints, including all supervisory reviews of the completed investigation, shall be as thorough as necessary to reach reliable and complete findings.  SPD shall ensure that, in all investigations involving uses of force, IIU investigators make thorough efforts to find and interview witnesses, exhaust all leads, and fully analyze all of the information available in force investigations.  Specifically:

      a.     All witnesses, including officers witnessing or involved in an incident that becomes the subject of a personnel complaint, shall provide a written statement regarding the incident or be interviewed as described below;

b.  IIU interviews will be audio-recorded.  To the extent this requires modification to various involved union contracts, the City agrees to make due and diligent efforts to negotiate such modifications in accordance with this paragraph.  If a civilian refuses to submit to a recorded interview, the IIU investigator will document the refusal and take a written statement from the witness;

c.  SPD shall investigate every allegation of misconduct that arises during an investigation even if an allegation is not specifically articulated as such by the complainant;

d.  Investigators will report and analyze all relevant evidence, including circumstantial, direct and physical evidence, as appropriate;

e.  IIU reports shall clearly set forth each and every allegation of misconduct, the SPD policy or policies that governs each allegation of misconduct, and the evidence the investigation uncovered that bears on each allegation of misconduct; and

f.  IIU reports shall be well-organized, not repetitive, clear, and easy to review and understand.

101.   An investigation shall not be closed simply because the complaint is withdrawn unless there is documentation of the circumstances of the complaint being withdrawn, and approval by the Superintendent.  If the complainant is unable or unwilling to provide additional information beyond the initial complaint, the investigation will continue as necessary to resolve the original allegation(s) where possible based on the available evidence and investigatory procedures and techniques.

102.   If at any time during the intake or investigation of the misconduct complaint the investigator finds evidence indicating apparent criminal conduct by any SPD personnel, the investigator shall promptly notify the head of IIU and the Superintendent.  The Superintendent or their designee shall consult with the relevant prosecuting agency or federal law enforcement agency regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, IIU shall continue with the administrative investigation(s) of the allegation, absent specific circumstances that would jeopardize the criminal investigation.   If the matter proceeds on a parallel track, any compelled interview of the subject officers may be delayed.  The decision to postpone the administrative investigation, along with the rationale for doing so, will be

23

documented in writing and reviewed by the Superintendent or his/her designee.

103.    The City agrees to make to make due and diligent efforts to negotiate with the unions to modify contracts to permit SPD to extend the timeframe within which charge letters must be generated, and/or permit IIU to receive extensions of time to complete certain investigations where additional time is necessary to ensure thoroughness and compliance with the terms of this Agreement.

104.    Nothing in this Agreement or SPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work-related incident or activity.  SPD agrees to make clear in policy and training that all officer statements in incident reports, arrest reports, use-of-force reports and similar documents, and statements made in interviews such as those conducted in conjunction with routine use-of-force review and investigation processes, are part of each officer's routine professional duties.

105.    Where an officer believes that providing an oral or written statement will be self-incriminating, the employee must affirmatively state this in writing at the time the request for the statement is made and before the statement is due and will not be required to provide a statement unless formally compelled upon approval by the Superintendent, who will consult with the relevant prosecuting agency as appropriate. If the officer refuses to reduce their refusal to writing, the IIU investigator will document the refusal. SPD policies shall require that in all misconduct investigations, prior to taking a statement from or questioning a subject employee, the employee shall be informed of his or her rights and potential consequences related to providing a voluntary or compelled statement and shall be required to sign a form indicating that the officer has been advised of these rights and potential consequences and indicating whether the statement is being compelled or provided voluntarily.

106.    IIU shall implement an electronic records management system, including converting all personnel files of current sworn officers to electronic form and maintaining all new complaints and investigational materials in electronic form.  SPD shall create the new electronic records management system within 18 months of the Effective Date.  This system will be part of SPD's comprehensive departmentwide record management system.

### 4.    Resolution of Complaints

107.    The resolution of any misconduct complaint must be based upon the preponderance of the evidence.  Each allegation of misconduct in an investigation of an SO shall

have one of the following dispositions:

    a.  "Unfounded," where the investigation determines, by clear and convincing evidence, that the alleged misconduct did not occur or did not involve the subject employee;

    b.  "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred;

    c.  "Exonerated," where the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate the law or SPD policy; or

    d.  "Sustained," where the investigation shows, by a preponderance of the evidence, that the alleged misconduct did occur and did violate the law or SPD policy.

108.    If, following a thorough investigation, IIU recommends that an allegation of misconduct be Unfounded or Exonerated, or IIU recommends that an allegation of misconduct be Sustained and the discipline matrix (see paragraph 129) shows that discipline would be five days suspension or less, IIU shall follow the following procedures:

    a.  Investigators will make credibility determinations, as appropriate, including;

        i.  Critically evaluating an officer's statement against other evidence. Misconduct investigators will not disregard a witness's statement solely because the witness has some connection to either the complainant or the officer or because the witness or complainant has a criminal history, but those factors should be considered along with other indicia of credibility;

        ii.  Making all reasonable efforts to resolve material inconsistencies between officer, complainant, and witness statements; and

        iii.  Making credibility determinations about civilian, officer, and witness statements based on independent, unbiased, and credible evidence;

    b.  IIU, in consultation with the IIU attorney, shall make recommendations for a finding of Unfounded, Exonerated, or Sustained (if discipline is a five day suspension or less) based upon the evidence that bears on the truth of each allegation.  The IIU attorney will have final review and approval of all recommendations.

c.  IIU will send the full investigation file, including written credibility
    determinations and recommended findings, to the Superintendent for review.  The
    Superintendent may ask questions of IIU, send the file back to IIU for additional
    investigation, and/or make its own recommendation regarding findings.

109.   If, following a thorough investigation, the IIU cannot recommend that an
allegation of misconduct be Unfounded, Exonerated, or Sustained (with discipline of five days
suspension or less), IIU shall send the full investigative file to the Board of Police
Commissioners for review without including the information set forth in paragraph 108.  IIU
shall include in these files a memo setting forth the applicable policies implicated in the
misconduct investigation and the evidence related to each potential violation of policy.  The
Board of Police Commissioners may ask questions of IIU and/or send the file back to IIU for
additional investigation.

110.   Within 21 days of receiving an investigation file where IIU does not recommend
Unfounded, Exonerated, or Sustained (with discipline of five days suspension or less), the Board
of Police Commissioners shall review the file and decide whether to hold a hearing in conformity
with the Massachusetts Open Meeting Law to determine whether each allegation of misconduct
should be Sustained, Not Sustained, Unfounded, or Exonerated under a preponderance of the
evidence standard.  If the Board of Police Commissioners finds by a preponderance of the
evidence that the information in the IIU file permits a recommendation of one of the four
findings, the Board of Police Commissioners may recommend a finding without holding a
hearing.

111.   The Board of Police Commissioners will make the final decision on all cases
received pursuant to paragraph 109, and any other case the Superintendent designates, and has
authority to require a hearing on any allegation of misconduct, notwithstanding IIU or the
Superintendent's recommendations.  If the Board of Police Commissioners' decision varies from
a recommendation of IIU and/or the Superintendent, the City will report such decisions in the
quarterly report on the City website.  The report will contain a brief description of the underlying
incident, the SO number, the recommendation made and the discipline actually imposed, if any.
If there is a deviation from the recommendation a brief explanation for the reason for the
deviation will be noted.  Any time the Board of Police Commissioners imposes lesser discipline
than recommended, the Compliance Evaluator will be advised within 72 hours.

26

112.    IIU will have regular opportunities to provide feedback and suggestions, based on complaints received and evidence uncovered in investigations, to the Superintendent and the Board of Police Commissioners.  This feedback may include but is not limited to: officer trainings and counseling needs, and SPD policies, strategies, and tactics.

### 5.    Training for Complaint Investigation

113.    SPD will provide comprehensive training to IIU investigators about proper complaint intake, investigation, and report-writing techniques.  This training shall be provided to officers upon assignment to IIU, and IIU investigators shall receive refresher trainings each year. The training shall occur within one year of the Effective Date.  The training shall include instruction in:

    a.    Investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;

    b.    The particular challenges of personnel complaint reviews/investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation, properly weighing credibility of witnesses, using objective evidence to resolve inconsistent statements, and the proper application of the preponderance of the evidence standard;

    c.    Relevant state, local, and federal law, including state employment law related to sworn officers and the rights of public employees, as well as criminal discovery rules such as those set out in *Garrity v. New Jersey*, 385 U.S. 493 (1967), and *Brady v. Maryland*, 373 U. S. 83 (1963); and

    d.    SPD rules and policies, including the requirements of this Agreement, and protocols related to criminal and IIU investigations of alleged misconduct.

114.    SPD will provide comprehensive training to supervisors about proper complaint investigation of PIEs.  This training shall be provided upon promotion to a supervisory role and incorporated into annual supervisor training.  The training shall include instruction in conducting investigations, objectively analyzing evidence, and discipline, under the provisions set forth in this Agreement.

### 6.    Board of Police Commissioners

115.    The Parties recognize that effective civilian and community oversight of SPD is essential to rebuilding trust between SPD and the communities it serves and ensuring that SPD's

27

enforcement activities reflect community values and are consistent with the Constitution and federal, state, and local laws.

116.     In order for the Board of Police Commissioners to carry out this important function, the City shall develop a process for any Springfield resident interested in serving on the Board of Police Commissioners to submit letters of interest to the Mayor's office setting forth a brief explanation of why they are interested and a brief summary of their background.

   a.  The members of the Board of Police Commissioners must be persons of integrity. Potential Board members should recognize the significant commitment of time that Board membership requires and be willing to commit sufficient time to the effort.

   b.  The membership shall be appointed by the Mayor and should include representation from a diverse cross-section of the Springfield community.

   c.  The City will also post the terms and expiration dates of the Commissioners publicly on the website, as well as information about when vacancies occur, and the opportunity to submit letters of interest.  No more than two Board of Commissioners' members shall be former members of SPD.  Former SPD members must be separated from SPD for at least two years before being eligible to serve on the Board of Commissioners.

117.     The Board of Police Commissioners will consist of five members.  The Mayor will have exclusive authority to appoint all Board of Police Commissioners members.

118.     The City will create a Board of Police Commissioners manual that will clearly lay out the Board's administrative processes, including, but not limited to, prevention of bias in decisions, confidentiality requirements; how to conduct thorough reviews and evaluations of individual complaints; how to obtain documents and/or any additional evidence required to conduct an effective review of a civilian complaint; how to conduct effective reviews and hearings that lead to supportable disposition decisions; and how to make a disposition and impose discipline.

119.     The City will provide comprehensive training to Board of Police Commissioners members upon their appointment and ensure that Board of Police Commissioners members receive refresher trainings annually.  Trainings shall include instruction on SPD use of force policies; proper uses of force; how to conduct and review investigations and make credibility

28

determinations; and appropriate, fair, and consistent discipline.

120.     The Board of Police Commissioners will have the power to subpoena documents or witnesses, and otherwise has access to all documentation, evidence, or other information necessary to fully evaluate the complaints.

121.     The City will ensure that the Board of Police Commissioners has the resources to fulfill its responsibilities, including but not limited to budget, staffing, compensation, training, and capacity.

122.     On a quarterly basis, the Board of Police Commissioners will post quarterly summaries of meetings and hearings on the City's website.  The summaries will maintain the confidentiality of the identities of the officer and complainant, and include, at minimum, the following:  the subject matter of the complaint, the date of the incident underlying the complaint, the evidence that the Board of Police Commissioners evaluated, the Board of Police Commissioners' disposition, and a summary of the reasons for the Board of Police Commissioners' disposition (e.g., body worn camera footage exonerated officer).  Following the final decision on the disposition of each complaint, the Commissioners will cause to have inserted an explanation in the file.

123.     The Board of Police Commissioners will hold a public meeting annually, at an accessible time and location, so that the public can learn more about the Board of Police Commissioners' functions and work.  The Board of Police Commissioners will widely publicize the meeting.

124.     The City will issue an annual report that summarizes, at a minimum, complaint trends, including the number and types of complaints received, the disposition of complaints by complaint type and source, the Board of Police Commissioners' discipline decisions, and assesses the Board of Police Commissioners' public outreach functions.

125.     Within one year of the effective date, the Board of Police Commissioners and the Superintendent, after consulting with the Compliance Evaluator, will draft an oversight and improvement report and present it to the City.  The report will assess and make recommendations on:

> a.   Whether there are impediments to SPD's civilian complaint processes that inhibit the ability of the Springfield community to obtain accountability for misconduct;
>
> b.   Whether changes should be made to the administration and/or functions of the

Board of Police Commissioners to improve its efficacy, including, but not limited to, investigations, resources, and coordination with and independence from SPD;

c. How existing civilian-police communication and accountability structures can be improved, or whether additional or different civilian or community oversight entities are necessary to provide guidance on community perspectives on SPD policies and practices and SPD's civilian complaint processes;

d. The Board of Police Commissioners' communications with the community, and whether the community has sufficient access to information about the Board of Police Commissioners' organization, complaint investigation activities, and discipline recommendation processes; and

e. the Board of Police Commissioners' communications with complainants to ensure that they are apprised of the status of their individual complaints.

The report and its recommendations will be posted publicly on the City's website.  Within three months of the issuance of final report, the Mayor will determine which of the Board of Police Commissioners' recommendations to adopt with a public explanation for adopting or not adopting each recommendation.

### 7.    Discipline

126.    SPD shall ensure that it holds accountable all officers who commit misconduct pursuant to a disciplinary system that is fair, consistent, and provides due process; that bases discipline on the nature of the charges and available evidence; and that considers mitigating and aggravating factors consistently and appropriately.

127.    Each sustained misconduct allegation shall be considered for the purposes of recommending discipline.

128.    IIU shall ensure that the full investigative file, along with all recommendations of discipline made throughout the process, is provided to the Superintendent or the Board of Police Commissioners for the ultimate determination of whether to impose discipline.

129.    In order to ensure consistency in the imposition of discipline, within 9 months of the Effective Date, SPD will review its current disciplinary matrices, policies, and procedures. SPD will amend its current matrices, policies and procedures to ensure that they:

a. Establish a presumptive range of discipline for each type of violation;

b. Increase the presumptive discipline based on an officer's prior violations;

    c.   Set out defined mitigating and aggravating factors;

    d.   Prohibit consideration of the officer's race, religion, gender, gender identity, sexual orientation, national origin, age, ethnicity, or familial relationships;

    e.   Prohibit consideration of the high (or low) profile nature of the incident;

    f.   Prohibit taking only non-disciplinary corrective action in cases in which the disciplinary matrices call for the imposition of discipline;

    g.   Provide that the SPD will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed; and

    h.   Require that any departures from the discipline recommended under the disciplinary matrices be justified in writing.

130.    To the extent the above paragraph requires modification to various involved union contracts, the City agrees to make due and diligent efforts to negotiate such modifications in accordance with the above paragraph.

131.    The IIU shall maintain all SO investigation reports and files after they are completed for the duration of the officer's employment with SPD.  Once the officer leaves SPD employment, that officer's disciplinary record will be maintained as a personnel record by SPD's Human Resources Division in the normal course of business.

## V.    TRANSPARENCY AND INTERNAL OVERSIGHT

### A.    Data Collection and Analysis

132.    SPD will collect and maintain all data and records necessary to accurately evaluate its use of force practices and facilitate transparency about its use of force.  As permitted by law, SPD agrees to enable broad public access to information related to SPD's conduct, activities, and accountability efforts as they relate to the use of force.  To achieve this outcome, within three months of the Effective Date, SPD will designate an individual or individuals as the "Data Collection and Analysis Coordinator."  The Data Collection and Analysis Coordinator can either be an employee or an outside contractor.  The Data Collection and Analysis Coordinator will have the responsibilities below.

133.    The Data Analysis and Collection Coordinator will ensure that the General Records Management System electronically collects and tracks   all documents related to uses of force and allegations of misconduct and related materials, including:

a. Officers' use of force reports;

b. Supervisors' use of force investigations;

c. Force investigations by the Force Investigation Team;

d. Force reviews conducted by the Use of Force Committee;

e. Force investigations conducted by IIU; and

f. All supporting documentation and materials, including arrest reports, relevant ECW downloads, supporting audio-visual recordings, including witness and officer interviews, and any relevant camera downloads, including from body worn cameras.

134.   The Data Analysis and Collection Coordinator will ensure the creation and maintenance of a reliable and accurate electronic system to track all data derived from force-related documents, including:

a. The type(s) of force used and whether it was determined to be in or out of policy;

b. Whether an officer unholstered a firearm;

c. The actual or perceived race, ethnicity, age, and gender of the subject

d. The name, shift, and assignment of the officer(s) who used force;

e. The bureau, unit, or patrol sector where the use of force occurred;

f. Whether the incident occurred during an officer-initiated contact or a call for service;

g. Any objective indicia of the subject's condition, including any observed physical disability/impairment, slurred speech, demeanor consistent with drug, alcohol or altered state of consciousness, apparent confusion, or other objective evidence of the subject's mental or medical condition, use of drugs or alcohol, at the time force was used;

h. The subject's actions that led to the use of force, including whether the subject was in possession of a weapon;

i. Whether the subject was handcuffed or otherwise restrained during the use of force;

j. Any injuries sustained by the officer or the subject or complaints of injury, and whether the officer or subject received medical services;

32

  k. The number of force-related complaints investigated and the disposition of those complaints;

  l. Whether the subject was charged with an offense, and, if so, which offense(s);

  m. For deadly force incidents, the number of shots fired by each involved officer, the accuracy of the shots, and whether the subject was armed or unarmed; and

  n. The length of time between the use of force and the completion of each step of the force investigation and review.

135. The Data Analysis and Collection Coordinator will regularly review and formally assess, at least annually, all forms and data collection systems to improve the accuracy and reliability of data collection.  This assessment will be provided to DOJ.  The assessment will also be published on the City's website.

136. Within four months of the Effective Date, the Data Collection and Analysis Coordinator will develop and implement a protocol to accurately analyze the data collected, ensure that officers are accurately reporting their uses of force (for example, by reviewing arrest reports for indications that force was used and reviewing IIU civilian complaints), and allow for the assessment required below.  This protocol will be subject to the review and approval of DOJ.

137. Within 90 days of the development of the protocol, and semi-annually thereafter, the Data Analysis and Collection Coordinator, working with the Superintendent and the UFC, will analyze the prior six month's force data, including the force related data listed above, to determine if any underreporting is occurring; assess any officer-specific, bureau or unit-specific, and department-wide trends; and identify and correct deficiencies revealed by this analysis.  The analysis will include reviews of FIT and other force investigations; UFC determinations and recommendations; force reporting; officer injury reports and incidents in which medical assistance was requested or provided following a use of force; and complaints alleging unreasonable use of force.  The audit will particularly identify any underreporting of force within the FIU and conduct cross-officer comparisons of the use of force rate within the FIU. SPD will document its findings in a public report to be published on the City's website.

138. SPD shall conduct a semi-annual audit of IIU's complaint intake, classification, investigations, credibility determinations, and recommendations (per paragraphs 86-111) related to use of force and document its findings in a public report to be published on the City's website. The audit will include an assessment of the number, type, and source (i.e., internal or external) of

33

complaints received, the disposition of complaints by type and source, and the average length of complaint investigation and disposition.

## VI.    TRAINING

139.    SPD will ensure that all officers receive adequate training to understand: (a) how to police effectively and safely and in accordance with SPD policy; and (b) the requirements of this Agreement, Massachusetts law, and the Constitution and laws of the United States.  Unless otherwise noted, SPD will develop and deliver all training pursuant to this Agreement within 18 months of the Effective Date.

### A.    Training Plan

140.    Within 18 months of the Effective Date of this Agreement, SPD will develop a written Training Plan that addresses recruit academy training, field training, and comprehensive in-service training for officers.  At a minimum, the Training Plan will encompass all training related to this Agreement.  The Training Plan will identify training priorities; ensure coordination between recruit training, in-service training, and field training; establish the frequency and subject areas for in-service training; identify available training delivery and related resources, as well as unmet needs, such as instructors, curricula, and equipment; and establish a rubric for assessing the content and delivery of training, including training provided by outside instructors or non-SPD entities.

### B.    Field Training Program

141.    Within six months of the Effective Date, SPD will develop policies and procedures to govern an effective field training program for all new SPD recruits, and specialized field training for all officers newly assigned to specialized units within SPD.

142.    In order to ensure only highly qualified officers participate in the field training program, SPD will develop protocols and eligibility criteria that consider appropriate factors, including performance history, disciplinary and complaint history, and demonstrated commitment to using force only consistent with SPD policy.  Within one year of the Effective Date, selected officers will be trained on the field training program.

143.    The City agrees to make due and diligent efforts to negotiate modifications with the unions to create a formal Field Training Officer ("FTO") program that codifies the above-referenced eligibility criteria and ensures that, once selected, FTOs receive regular training that

34

addresses supervision and leadership skills, effective problem-solving techniques, and effective field communication.  FTOs will be required to maintain a demonstrated record of high performance to continue serving as FTOs.

      **C.**    **Training Development and Administration**

      144.    For all training required by this Agreement, the head of SPD's Training Division will review all training curricula, lesson plans, and procedures for consistency, quality, accuracy, currency, completeness, and compliance with applicable law and SPD policy, and ensure that they effectively teach SPD personnel to understand and follow SPD policies.  The head of SPD's Training Division will ensure that a variety of adult learning techniques, scenario-based training, and problem-solving practices, in addition to traditional lecture formats, are incorporated into all training.  All curricula and lesson plans required by this Agreement will be reviewed and approved by DOJ prior to implementation.

      145.    SPD will ensure that instructors are qualified and use only approved curricula, lesson plans, and testing materials.  SPD will actively seek out and retain qualified instructors from outside SPD to supplement the skills of its in-house training staff and adjunct instructors.

      146.    Within nine months of the Effective Date, SPD will create a Force Training Review Committee that will annually conduct a needs assessment for future force training considering misconduct complaint trends, problematic uses of force, court decisions, research reflecting the latest in law enforcement trends, individual bureau or unit needs, and any changes to Massachusetts law and SPD policy.  This annual needs assessment will be provided to DOJ for review and approval.

      147.    The Force Training Review Committee will be led by the head of the Training Division, and will include Training Division staff members, the head of the FIU, and the Quality Assurance Captain. To ensure continuity of actions and coordination of efforts between the Force Training Review Committee and the UFC, the designated UFC Deputy Chief, Training Division supervisor, and one Board of Police Commissioners representative will also serve on the Force Training Review Committee.

      **D.**    **Documentation of Training**

      148.    For all training required by this Agreement, within one year of the Effective Date, SPD will develop and implement a system that will allow the Training Division to electronically track, maintain, and produce complete and accurate records of current curricula, lesson plans,

training delivered, and other training materials in a centralized electronic file system.  The system will also allow officers to digitally acknowledge completion of each training course (whether provided through SPD or outside sources) as well as completion of annual training requirements and training on any new or substantially revised policies.  The City will ensure that adequate resources are provided to maintain the system and keep it updated.

149.     SPD will develop and implement accountability measures, including disciplinary and non-disciplinary corrective action, to ensure that all officers successfully complete all required training programs in a timely manner.

## VII.   SUPERVISION

### A.     Duties and Training of First Line Supervisors

150.     SPD will ensure that first-line supervisors provide close and effective supervision of officers.  This close and effective supervision includes responding to, investigating, reviewing, and documenting force as required by this Agreement; monitoring, commanding, and controlling incidents and calls for service; reviewing arrest reports for compliance with law and this Agreement; identifying training and professional development needs; and providing leadership, counseling, redirection, and support to officers as needed.

151.     The City and SPD agree to provide appropriate supervisory staffing levels to facilitate close and effective supervision, and to the extent feasible, unity of command.

152.     Within one year of the Effective Date, SPD will develop and implement mandatory supervisory training for all new and current supervisors.  Training for new and current supervisors will include the following topics:

    a.   De-escalating conflict;

    b.   Evaluating written reports, including identification of canned or conclusory language that is not accompanied by specific facts;

    c.   Reviewing and investigating officer uses of force;

    d.   Responding to and investigating allegations of officer misconduct;

    e.   Monitoring use of force to ensure consistency with policies;

    f.   Legal updates;

    g.   Strategies for effectively directing officers to minimize uses of force and to intervene effectively to prevent or stop unreasonable force;

    h.   Support for officers who report unreasonable or unreported force, or who are retaliated against for attempting to prevent unreasonable force;

    i.    Techniques for effectively guiding and directing officers and promoting effective and constitutional police practices;

    j.    Understanding supervisory tools such as the Early Intervention System and body worn cameras;

    k.   Evaluating officer performance; and

    l.    Consistent disciplinary sanction and non-punitive corrective action.

153.    Thereafter, all sworn supervisors will receive adequate in-service management training, which may include updates and lessons learned related to the topics covered in the supervisor training and other areas covered by this Agreement.

154.    SPD will hold supervisors directly accountable for the quality and effectiveness of their supervision.

**B.**    **Early Intervention System**

155.    Within 18 months of the Effective Date, SPD will create an Early Intervention System ("EIS") as a management tool to promote supervisory awareness, proactively identify problematic behavior among officers, and ensure that appropriate interventions occur before discipline is required.

156.    The City will ensure SPD has reasonable resources to implement and maintain the EIS, including its ongoing hardware and support requirements.

157.    The EIS will be:

    a.    Customizable to SPD's particular needs;

    b.    Adaptive as new information becomes available;

    c.    Able to be audited and validated to improve accuracy, reduce false outcomes, and timeliness of intervention;

    d.    Able to prioritize officers for intervention; and

    e.    Able to assess the efficacy of the intervention.

158.    The EIS will include a computerized relational database that will be used to collect, maintain, integrate, and retrieve department-wide, district-wide, and bureau or unit-wide data, as well as data for each officer.  The database will maintain appropriate data regarding uses

of force, all injuries and deaths to persons in custody, civilian complaints, and other data consistent with best practices to enable early interventions by SPD.

159.    SPD will contract with a qualified service provider to implement the EIS relational database.

160.    Within 18 months of the Effective Date, SPD will develop a comprehensive EIS protocol that will include policies setting forth the specific information that the EIS will capture, data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation, audits, access to the system, and confidentiality of personally identifiable information.

161.    All required information, including interventions, shall be entered into the EIS database in a timely, accurate, and complete manner by SPD supervisors and other responsible individuals.  SPD will securely and confidentially store all data.  SPD will maintain all officer specific information in EIS for at least five years following the officer's separation from SPD, unless prohibited by law.  Information necessary for aggregate statistical analyses will be maintained indefinitely.

162.    Within 18 months of the Effective Date, SPD will retain or internally develop the expertise necessary to implement individualized interventions to respond to identified problematic or potentially problematic officer conduct. Non-disciplinary interventions will be timely implemented and designed to assist officers in avoiding or correcting potentially problematic behavior. SPD will review, evaluate, and document in writing the progress and effectiveness of the intervention strategy.

163.    SPD will develop a plan for ensuring appropriate and regular supervisory review of EIS indicators, which will include comparisons between officers with similar assignments to determine possible outliers and duties and appropriate trigger thresholds.

164.    SPD will provide in-service training to all employees, including officers, supervisors, and commanders, regarding the EIS within 60 days of its implementation to ensure proper understanding and use of the system.   SPD will ensure that all supervisors are trained on how to use the EIS system, interpret its outputs, evaluate and make appropriate comparisons in order to identify any significant individual or group patterns, and perform any necessary interventions.

C.      **Performance Evaluations and Assignments**

165.      SPD will ensure that officers who police professionally and effectively receive appropriate consideration for assignment.  SPD will further ensure that poor performance or policing that otherwise undermines public safety and community trust is reflected in supervisor evaluations.

166.      The City agrees to make due and diligent efforts to negotiate with the unions to modify contracts to permit SPD to develop and implement fair and consistent practices to accurately evaluate and document supervisor performance on both an ongoing and annual basis. The development and implementation of these practices by SPD will be done in coordination with the City's Human Resources Department.  SPD will assess all critical areas of supervisory performance, including use of de-escalation strategies; evaluating written reports; responding to and investigating allegations of officer misconduct; effectively guiding and directing officers and promoting effective and constitutional police practices; disciplinary and non-punitive corrective actions; successful completion of training; integrity; and other critical police functions.  The evaluations will not include boilerplate language and will cite specific examples of supervisor conduct.

167.      Within one year of the Effective Date, SPD will develop and implement fair and consistent policies for promotions and assignments to specialized units in order to identify officers who are effective, professional, and qualified for the role in question. To the extent this requires modification to various involved union contracts, the City agrees to make due and diligent efforts to negotiate such modifications in accordance with this paragraph. Where possible, SPD will also consider the below factors when utilizing the bypass process for promotions under Massachusetts General Law Chapter 31.  In determining whether the officer is likely to be effective and appropriate for the position to which they are being considered for assignment, the appointing authority will consider appropriate factors, including:

a.   Effective use of community and problem-oriented policing strategies;

b.   The number and circumstances of uses of force;

c.   Disciplinary record;

d.   Report writing skills;

e.   Problem-solving skills;

f.   Interpersonal skills;

    g.   Support for departmental integrity measures; and

    h.   Pending disciplinary process.

168.    Officers with a sustained history of civilian complaints of, or who have been disciplined or entered into a disciplinary agreement for, unreasonable use of force, discrimination, or dishonesty will be presumptively ineligible for assignment to IIU or the FIU.

### D.    Officer Wellness

169.    Within one year of the Effective Date, SPD will develop and maintain an officer assistance and support program, which will provide access to no- or low-cost counseling and mental wellness services including: confidential counseling services; crisis counseling; stress management counseling; and mental health evaluations.  Supervisors will be trained on the resources available and will ensure that officers are aware of these resources.

## VIII.  BODY WORN CAMERAS

170.    SPD has provided all members of the FIU with body-worn cameras.  Within six months of the Effective Date, SPD will develop policies and training to ensure they are used appropriately.

171.    At a minimum, SPD's body-worn camera protocols will:  clearly state which officers are required to use body-worn cameras and under which circumstances; require officers to document the existence of any body-worn camera footage on all required reports; mandate that officers report to their supervisors and articulate in writing their reasons for failing to record an activity that SPD policy otherwise requires to be recorded, require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible; and establish a protocol governing the download, supervisory review, and retention of body-worn camera recording that is consistent with best practices.

172.    Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body-worn cameras in violation of SPD policy.

173.    SPD will develop and implement protocols for testing equipment and preserving recordings to foster transparency, increase accountability, and build trust, while protecting the privacy rights of individuals.

**IX.    POLICIES, PROCEDURES, AND PROTOCOLS**

174.    SPD will develop, revise, and implement policies and procedures to fully incorporate the terms of this Agreement and comply with applicable law.  SPD will ensure that its policies and procedures are plainly written, logically organized, use terms that are clearly defined, and comport with recognized policing standards.  Unless otherwise noted, SPD will develop all policies and procedures pursuant to this Agreement within 18 months of the Effective Date.

175.    Within one week of approval, SPD will post approved policies and procedures on the City's website to ensure public accessibility.  There will be reasonable exceptions for policies and procedures that are law enforcement sensitive, such as procedures regarding undercover officers or operations.    SPD will create a mechanism for the public to provide feedback on policies once they are published, and then incorporated into SPD's reassessment as stated below.

176.    SPD will review each policy or procedure related to this Agreement one year after it is implemented and annually thereafter, to ensure that the policy or procedure provides effective direction to SPD personnel and remains consistent with this Agreement, and current law.  In addition to annual reviews, SPD will review and revise policies and procedures on an ongoing basis as necessary and appropriate given public feedback, and upon notice of a significant policy deficiency during audits or reviews.

177.    SPD will maintain a complete, up-to-date manual of all SPD policies and procedures that is indexed and maintained in an organized manner using a uniform numbering system for ease of reference.  Officers and employees will have access to the manual, in hard copy or electronic format.  Revisions and updates to SPD policies and procedures will be incorporated into the manual.

178.    SPD will ensure that changes in case law and statutes that are relevant to the work of SPD are disseminated to appropriate SPD personnel in a timely manner and incorporated, as needed, into SPD policies, procedures, and training.

179.    SPD will ensure that officers from all varying ranks and units have a meaningful opportunity to review and comment on new or existing policies and procedures.

180.    SPD will submit all policies, procedures, protocols, manuals, training materials, and any other administrative orders or directives related to this Agreement to DOJ for review and approval prior to publication and implementation.

181.    Within 30 days of DOJ approval of any policy, SPD will provide DOJ with a roll-call training curriculum.  Upon approval, the roll-call training will be delivered to all officers as soon as practicable and in any case within 30 days, after which the revised policy will be effective.

## X.    IMPLEMENTATION, ASSESSMENT, OUTCOMES, AND ENFORCEMENT

### A.    Role of the Independent Compliance Evaluator

182.    The Parties will jointly select an Independent Compliance Evaluator ("Compliance Evaluator") who will assess and report whether the requirements of this Agreement have been implemented, and whether this implementation is resulting in constitutional and effective policing.  The Compliance Evaluator will work with the Parties to identify and address any barriers to compliance and provide technical assistance to SPD to overcome those barriers.

183.    The Compliance Evaluator will only have the duties, responsibilities, and authority conferred by this Agreement.  The Compliance Evaluator will not, and is not intended to, replace or assume the role and duties of any SPD employee, including the Board of Police Commissioners, or the Superintendent, or any other City official.  The Compliance Evaluator's role is expressly limited to reporting on the implementation of this Agreement, and it is not the role of the Compliance Evaluator to change either the scope or the terms of the Agreement.

184.    As an agent of the Court, the Compliance Evaluator will be subject to the supervision and orders of the Court, consistent with this Agreement and applicable law.

### B.    Selection and Compensation of the Compliance Evaluator

185.    Within 90 days of the Effective Date, or additional time if agreed to by the Parties, the City and DOJ will together select a Compliance Evaluator.  In selecting a Compliance Evaluator, the parties agree to ensure the selection of an individual of the highest ethics, expertise in law enforcement, and a demonstrated commitment and capacity to ensure constitutional policing.  The Parties' Compliance Evaluator selection will be subject to the approval of the Court with jurisdiction over this Agreement.

186.    If the Parties are unable to agree on a Compliance Evaluator selection within the timeframe agreed to by the Parties, each Party will submit a proposed Compliance Evaluator to the Court, and the Court will select the Compliance Evaluator from the Parties' proposals.

187.    The Compliance Evaluator will be appointed for a period of three years from the Effective Date, subject to an evaluation by the Court to determine whether to renew the Compliance Evaluator's appointment until the termination of this Agreement.  In evaluating the Compliance Evaluator, the Court will consider the Compliance Evaluator's performance under this Agreement, including whether the Compliance Evaluator is completing their work in an effective manner and on budget, and is working effectively with the Parties to facilitate the efforts to comply with the Agreement's terms, including by providing technical assistance.

188.    The City will bear all reasonable fees and costs of the Compliance Evaluator. DOJ and the City recognize the importance of ensuring that the fees and costs borne by the City are reasonable, and accordingly fees and costs will be one factor to be considered in selecting the Compliance Evaluator.  The City may solicit "flat fee" arrangements with any Compliance Evaluator selected per the terms of this agreement.  In the event that any dispute arises regarding the reasonableness or payment of the Compliance Evaluator's fees and costs, the City, DOJ, and the Compliance Evaluator will attempt to resolve such dispute cooperatively prior to seeking the assistance of the Court.  The Compliance Evaluator's budget will be filed as an addendum to this Agreement.  If, for any reason, the Compliance Evaluator anticipates that their fees will exceed the budget that is filed as an addendum to this Agreement, the Compliance Evaluator must seek leave of the court to have the additional costs approved.

189.    The Compliance Evaluator must submit monthly statements detailing the work that they did for the month, including the number of hours spent on each task, as well as a projection for future work.

190.    The Compliance Evaluator may request at any time to hire, employ, or contract with additional persons or entities reasonably necessary to perform the tasks assigned to the Compliance Evaluator by this Agreement, but will be judicious in their decision to do so.  Any person or entity hired or otherwise retained by the Compliance Evaluator to assist in furthering any provision of this Agreement will be subject to the provisions of this Agreement.  The Compliance Evaluator will notify the City and DOJ in writing of requests to select such additional persons or entities, identify all relevant qualifications, and specify the additional person(s)' budget.  If the City and DOJ agree with the proposal, the Compliance Evaluator will be authorized to hire or employ such additional persons or entities.  To the extent practicable, the Compliance Evaluator will submit their request for additional resources through the budget

43

development process for appropriation the next fiscal year.  If not, the request is subject to current fiscal year available funding or supplemental appropriation by the City Council.  If the Compliance Evaluator, City, and DOJ are unable to reach timely agreement on the request, the Court will resolve the dispute.

191.    Should any of the Parties to this Agreement determine that the Compliance Evaluator or the Compliance Evaluator's individual members, agents, employees, or independent contractors have exceeded their authority, or failed to satisfactorily perform the duties required by this Agreement, the Party may, after consultation with the Parties and Compliance Evaluator, petition the Court for such relief as the Court deems appropriate, including replacement of the Compliance Evaluator, and/or any individual members, agents, employees, or independent contractors.

192.    In the event that the Court orders the replacement of the Compliance Evaluator, or the Compliance Evaluator is no longer able to perform their functions, the City and DOJ will meet and confer to determine whether an outside Compliance Evaluator is still necessary.  If the City and DOJ are unable to agree on whether a Compliance Evaluator is still necessary, the City will file a motion with the Court seeking termination of the Compliance Evaluator position. After considering DOJ's response to the motion, the Court will resolve the dispute.  If it is determined that a Compliance Evaluator is still necessary to oversee implementation of the agreement, the City and DOJ will jointly identify and propose a replacement Compliance Evaluator to the Court for its review and approval.  In the event the parties are unable to jointly propose a replacement Compliance Evaluator within 60 days of a replacement being deemed necessary, each Party will submit a proposed replacement Compliance Evaluator to the Court, along with resumes and cost proposals, and the Court will select and appoint the Compliance Evaluator.

C.    **Responsibilities of the Compliance Evaluator**

193.    The core responsibilities of the Compliance Evaluator include:  developing a Compliance Plan, updated at least annually, to ensure effective assessments; conducting audits to assess the City's and SPD's compliance with the terms of this Agreement; conducting outcome measurements to determine if the Agreement is resulting in sustained constitutional policing with respect to use of force; providing technical assistance to the City and SPD; and issuing regular

reports to the public that explain in detail the status of SPD's progress in implementing this Agreement.

### 1. Compliance Evaluator Plan

194.    Prior to the appointment of a Compliance Evaluator, DOJ and the City will jointly agree on a detailed outline of key benchmarks for implementation of the Agreement.  Using that outline as guidance, within 90 days of assuming their duties, the Compliance Evaluator will develop a plan for conducting audits and outcome assessments ("Compliance Plan") and will submit the Compliance Plan to the Parties for review and approval.  The DOJ and City will provide input and advice to the Compliance Evaluator on the timelines, tasks, and reporting requirements included in the Compliance Plan.  The Compliance Plan will:

    a.  Provide an overview for audits and outcome assessments, which will enable SPD to reach Substantial and Effective Compliance with all material requirements of the Agreement within four years with sustained, committed implementation.  This overview will include a specific schedule and deadlines for the first two years of the Agreement and a general schedule for successive years;

    b.  Clearly delineate the requirements of this Agreement to be assessed for compliance, indicating which requirements will be assessed together, and a schedule for conducting a review of each requirement of this Agreement at least annually; and

    c.  Set out a schedule for conducting outcome measure assessments after the first two years of implementation and annually thereafter.

195.    The Compliance Plan will be provided to the Parties for review and comment and thereafter filed with the Court.  The Compliance Evaluator shall develop a Compliance Plan for each subsequent year of the Agreement, in accordance with the requirements above.  The Compliance Evaluator will initiate the development of the Compliance Plan for the upcoming year at least 90 days before the previous year's Compliance Plan concludes.

### 2. Audits

196.    Every six months, the Compliance Evaluator will conduct reviews to determine whether the City and SPD have complied with the requirements of this Agreement.  Compliance requires that the City and SPD: (a) have incorporated the requirement into policy; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the

requirement; and (c) are consistently following and holding SPD personnel to the requirements and standards enunciated herein.  Compliance reviews will contain the elements necessary for reliability and comprehensiveness.  Compliance reviews may be conducted using sampling and compilation data where appropriate.  At least 45 days prior to the initiation of any audit, the Compliance Evaluator will submit a proposed methodology to the Parties.  The Parties will submit any comments or concerns regarding the proposed methodology to the Compliance Evaluator no later than 15 days prior to the proposed date of the audit.  The Compliance Evaluator will modify the methodology as necessary to address any concerns or will inform the Parties in writing of the reasons it is not modifying its proposed methodology.  Any unresolved disputes involving the Compliance Evaluator's audit methodology may be submitted to the Court for resolution.

### 3. Outcome Measurements

197.    In addition to compliance reviews, the Compliance Evaluator will conduct qualitative and quantitative assessments to measure whether implementation of this Agreement has resulted in constitutional policing with respect to uses of force within the FIU.  These outcome assessments will include collecting and analyzing, at least annually, the following outcome data, trends, and patterns with respect to the FIU:

    a.  Use of force measurements, including:

        i.  Number of use-of-force incidents as compared to number of arrests, with use-of-force incidents broken down by force type, patrol shift, type of related arrest (if any); actual or perceived race, ethnicity, age, and gender of the subject;

        ii.  Number of injuries to officers and public, the rate at which officer and subject injuries decrease or increase overall and by severity of injury; force type, patrol shift, and actual or perceived race, ethnicity, age, and gender of the subject;

        iii.  Number of uses of force found to violate policy, broken down by force type, patrol shift, type of arrest (if any); actual or perceived race, ethnicity, age, and gender of the subject;

        iv.  Number of officers who have more than one instance of use of force in violation of policy;

     v. Force reviews or investigations indicating a policy, training, or tactical deficiency; and

     vi. Quality of force investigations and reviews; and number and rate of use of force administrative investigations which are returned for lack of completeness.

b. To the extent the use of force measurements listed in sub-section (a)(i) through (vi), above, are analyzed by the Compliance Evaluator, the analysis will be detailed in the report submitted. Such detail of the analysis will include:

     i. What use of force measurements were analyzed;

     ii. The criteria used to analyze the data relating to each use of force measurement; and

     iii. The basis for the analysis, e.g., peer reviewed studies supporting the conclusions drawn from the use of force measurement.

c. Training measurements, including:

     i. Number and percentage of officers provided training pursuant to this Agreement, broken down by the type of training provided;

     ii. Officers' evaluations of the adequacy of training in type and frequency;

     iii. Identification of training issues by the Force Training Review Committee and the steps taken by SPD to address those issues;

     iv. Modifications or improvements to training resulting from the review and analysis required by this Agreement; and

     v. Prevalence of training deficiencies as reflected by problematic incidents or performance trends. If conclusions on training deficiencies are being drawn by the Compliance Evaluator based upon either problematic incidents, and/or performance trends, such conclusions will be detailed, and any objective evidence supporting such a conclusion will also be specified.

d. Supervision measurements, including supervisors' initial identification of officer violations and performance problems, and the supervisors' responses to those violations and problems;

e.  To the extent supervision measurements listed in sub-section (d) above, are analyzed by the Compliance Evaluator, the analysis will be detailed in the report submitted.  Such detail of the analysis will include the criteria used to analyze the data relating to supervision measurements;

f.  Accountability measurements, including:

   i.  Number and source (internal or external) of complaints relating to the FIU, and whether any increase or decrease in this number appears related to access to the complaint process.  The Compliance Evaluator will provide an explanation of the conclusions drawn relative to access to the complaint process influencing the number of complaints.  Further, the Compliance Evaluator will document whether and to what extent the change in the number of complaints is related to the expansion of the definition of use of force, as called for in this Agreement;

   ii.  Filing and disposition of complaints against FIU officers by type of complaint, to include the race, ethnicity, age, and gender of the complainant and officer;  If the Compliance Evaluator draws any conclusions relating to the filing and disposition of complaints, and/or if they draw any conclusions based upon the race, ethnicity, age and gender of either the complainant or the officer, the conclusions drawn will be detailed in the report, as well as the basis for such conclusions, and any objective criteria supporting such conclusions;

   iii.  Number of sustained, exonerated, unfounded, and not sustained complaints against FIU officers, by type of complaint; If the Compliance Evaluator draws any conclusions relating to the disposition of complaints as set out herein, the conclusions drawn will be detailed in the report, as well as the basis for and any objective criteria supporting such conclusions;

   iv.  Number of allegations sustained against FIU officers delineated by discipline imposed on the officer. If the Compliance Evaluator draws any conclusions relating to the discipline imposed complaints as set out herein, the conclusions drawn will be detailed in the report, as well as

the basis for such conclusions, as well as any objective criteria
supporting such conclusions;

v.    Average length of time to complete investigations and adjudicate
complaints against FIU Officers by complaint type; If the Compliance
Evaluator draws any conclusions relating to the length of time to
complete investigations and adjudicate complaints, the conclusions
drawn will be detailed in the report, as well as the basis for such
conclusions, as well as any objective criteria supporting such
conclusions;

vi.    Number of FIU Officers who were subjects of multiple complaints or
who had repeated instances of sustained complaints; If the Compliance
Evaluator draws any conclusions relating to the number of officers with
multiple complaints, the conclusions drawn will be detailed in the report,
as well as the basis for and any objective, relevant, and reliable criteria
supporting such conclusions;

vii.    Arrests of FIU Officers for on- and off-duty conduct; If the Compliance
Evaluator draws any conclusions relating to the number of officers
arrested for on-and/or off-duty conduct, the conclusions drawn will be
detailed in the report, as well as the basis for and any objective criteria
supporting such conclusions.  Further, the City's response to such arrests
will also be detailed;

viii.    Criminal prosecutions of FIU Officers for on- or off-duty conduct; If the
Compliance Evaluator draws any conclusions relating to the number of
criminal prosecutions of officers for on- and/or off-duty conduct, the
conclusions drawn will be detailed in the report, as well as the basis for
and any objective criteria supporting such conclusions.  Further, the
City's response to such prosecutions will also be detailed;

ix.    Number and nature of civil suits against the City or SPD FIU Officers
for work-related conduct, and the amount of judgments against or
settlements resulting from those civil suits.  If the Compliance Evaluator
draws any conclusions relating to the nature and number of civil suits

49

against the City or FIU Officers, and/or the amounts of settlements or judgments arising from such suits, the conclusions drawn will be detailed in the report, as well as the basis for such conclusions, including any objective criteria supporting such conclusions. The City's response to the incident or incidents that form the basis of such lawsuit(s) will also be detailed and considered; and

x.   Community input data obtained as a part of SPD and the Compliance Evaluator's Public Engagement obligations (discussed in Section F below), related to FIU officer and community relations, use of force by the FIU, the IIU complaint process relating to complaints made against members of the FIU, the Board of Police Commissioners' role, and disciplinary outcomes.

g.   In conducting these outcome assessments, the Compliance Evaluator may elect to use any relevant data collected and maintained by SPD or the City (e.g., crime trend pattern analysis), provided that the Compliance Evaluator has determined, and the Parties agree, that this data is reasonably reliable and complete and relevant to an analysis of members of the FIU.

198.    At least 45 days prior to the initiation of any outcome assessment, the Compliance Evaluator will submit a proposed methodology to the Parties. The Parties will submit any comments or concerns regarding the proposed methodology to the Compliance Evaluator no later than 15 days prior to the proposed date of the assessment. The Compliance Evaluator will modify the methodology as necessary to address any concerns or will inform the Parties in writing of the reasons it is not modifying its proposed methodology. Any unresolved disputes involving the Compliance Evaluator's methodology may be submitted to the Court for resolution.

### 4.    Compliance Evaluator Recommendations and Technical Assistance

199.    The Compliance Evaluator may make recommendations to the Parties regarding actions necessary to ensure timely Substantial and Effective Compliance with this Agreement and its underlying objectives. Such recommendations may include a recommendation to modify a provision of this Agreement, a recommendation for additional training in any area related to this Agreement, or a recommendation to seek technical assistance. The Compliance Evaluator

does not have the authority to modify this Agreement through these recommendations, or any other means, without meeting the requirements for modification under paragraph 236 below.

200.    In addition to such recommendations, the Compliance Evaluator may also provide limited technical assistance consistent with the Compliance Evaluator's responsibilities under this Agreement.

201.    In the event that Substantial and Effective Compliance with this Agreement requires technical assistance beyond the scope and extent of the Compliance Evaluator's duties or budget, DOJ, the City, and/or the Compliance Evaluator will inform the Parties of the need for technical assistance and its relation to compliance with this Agreement.  The Compliance Evaluator, with assistance from the City, will arrange for the prompt initiation of the required technical assistance, to be performed by an independent contractor or a separate entity.  The cost for the technical assistance will be borne by the City and be additional to the budget of the Compliance Evaluator.  If any Party disagrees with the need for the requested technical assistance, the Party will consult the other parties and, if unable to resolve the issue, will timely inform the Court, which will resolve the dispute.

**D.    Compliance Evaluator Reports**

202.    The Compliance Evaluator will file with the Court, every six months, written, public reports that include the following:

a.  Description of the work conducted by the Compliance Evaluator during the reporting period;

b.  List of each Agreement requirement, indicating which requirements have been:

   i.    Incorporated into policy;

   ii.   The subject of sufficient training for all relevant SPD officers and employees; and

   iii.  Carried out in actual practice.  The Compliance Evaluator will detail what criteria has been utilized in order to determine whether the requirement has been carried out in actual practice.

c.  The methodology and specific findings for each compliance review conducted during that six-month period.  The underlying data for each compliance review will not be publicly available but will be retained by the Compliance Evaluator and provided to either or both Parties upon request;

    d.   For any requirements that were reviewed and found not to have been implemented, the Compliance Evaluator's recommendations regarding necessary steps to achieve compliance;

    e.   The methodology and specific findings for any outcome assessments conducted during that period; and

    f.   A projection of the work, including projected costs, to be completed during the upcoming reporting period and any anticipated challenges or concerns related to compliance with this Agreement.

203.    The Compliance Evaluator will provide a copy of the reports to the Parties in draft form within 15 business days after the end of each reporting period.  The Parties will have 15 business days upon receipt of the report to informally comment on the draft report.  The Compliance Evaluator will consider the Parties' responses and make appropriate changes, if any, before issuing the report.

204.    The Compliance Evaluator and Parties will have semiannual status conferences with the Court to discuss the City's compliance or noncompliance.

**E.    Communication between Compliance Evaluator, Parties, and Public**

205.    The Compliance Evaluator will maintain regular contact with the Parties in order to ensure effective and timely communication regarding the status of SPD's compliance with this Agreement.  To facilitate this communication, the Compliance Evaluator will hold regular status teleconferences and in-person or virtual meetings with the Superintendent, the Board of Police Commissioners, counsel for the City, SPD's Settlement Agreement Implementation Unit (described below), and DOJ on a schedule agreed upon by the Parties and the Compliance Evaluator.

206.    The Compliance Evaluator will hold quarterly public meetings with community stakeholders about this Agreement's scope and implementation process, and to explain the Compliance Evaluator's reports, as well as to hear community perspectives of interactions with FIU.  The Compliance Evaluator will provide reasonable notice to the Parties in advance of such meetings being held.

**F.    Public Engagement**

207.    Within nine months of the Effective Date, the City and SPD will develop and implement community engagement plans for creating opportunities for routine and frequent

positive interactions between officers and community members, including those critical of SPD. The community engagement plans will ensure that:

     a.   SPD allows for sworn representatives of SPD who interact with the public in the regular course of their activities to participate in neighborhood and community meetings and other community events;

     b.   SPD identifies the number and types of meetings to be attended;

     c.   SPD and the City provide for outreach in all neighborhoods, including neighborhoods where no neighborhood association has been established to provide consultation and input to SPD.

208.    SPD will ensure that it solicits input from a broad cross-section of community organizations and City representatives in Springfield on policies, practices, training, engagement programs, and enforcement strategies that affect the communities those groups and representatives represent.

209.    To inform the public about SPD's implementation of the Settlement Agreement, SPD shall develop a community outreach and public information program about the Agreement. The program shall include at least quarterly meetings and be open and accessible to the public (this includes accessible location, timing, format, and public comment platforms). During the meetings, SPD will inform the public about the requirements of this Agreement, update the public on SPD's progress meeting these requirements, discuss ongoing SPD reform, solicit input and increase awareness about the Board of Police Commissioners and IIU processes, increase transparency around the disciplinary process, and address other areas of community concern. At least one week before such meetings, SPD will widely publicize the meetings. The meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's rights and responsibilities during a police encounter. These meetings may be held together with the Compliance Evaluator, partially fulfilling also the Compliance Evaluator's public outreach obligations.

210.    SPD shall use its social media platforms to proactively communicate with community members, including sharing information related to meetings or opportunities for community engagement with or feedback on SPD and its reform efforts, as well as publicize

newly released public reports and/or important information related to reform efforts the community should be aware of and where that information can be found.

211.    On at least an annual basis, SPD will prepare a publicly available report of its community engagement efforts, including a breakdown by district. As part of this report, SPD will identify deficiencies and opportunities for improvement in initiatives for community engagement. The report will include specific problems addressed and steps taken by SPD and the community toward their resolution. The report will describe the ways SPD has sought input from the community related to the Agreement's implementation. The report will identify steps SPD has taken to measure officer outreach to community members.

212.    On an annual basis, the City and SPD will conduct a reliable, comprehensive, and representative survey of the Springfield community's experience with and perceptions of SPD in general, the FIU in particular, and public safety. Analysis of the results of this survey shall be provided to the Compliance Evaluator and included in the outcome assessments that are described in paragraph 197 and may be used to demonstrate sustained continuing improvement as this Agreement encourages. To conduct the community survey, the City will:

    a.  Develop measurements of public satisfaction with policing, attitudes among police personnel, and the quality of police-citizen encounters;

    b.  Identify representative samples of City residents, police personnel, and custodial arrestees so that the survey is designed to capture a representative sample of Springfield residents including members of each demographic category;

    c.  Observe community meetings and engage in informal conversations with Springfield residents, SPD officers and command staff, and DOJ representatives to identify current and recent issues or concerns specific to Springfield; and

    d.  Conduct the surveys in English, and Spanish or other languages, as necessary, to ensure representation of the entire Springfield community.

213.    SPD will analyze the results of the survey and will use this analysis to modify and improve SPD policies, training, and practices as needed.

214.    SPD and the City, in connection with outside consultants as necessary will develop the design and means of conducting the surveys.  They may consider, for example, previous survey instruments and data. SPD will actively work to organize focus groups of officers.

### G.   Transparency Regarding Efforts to Address Misconduct

215.   The City and SPD recognize the importance of transparency to improve SPD community relations and commit to the following provisions.

216.   After final disposition of misconduct complaints, SPD shall make detailed and anonymized summaries of each misconduct investigation readily available to the public, to the full extent permitted under state and federal law, in electronic form on a designated section of its website, that is linked to directly from SPD's home page with prominent language that clearly indicates to the public that the link provides information about investigations of misconduct by SPD employees.

217.   SPD will develop protocols to ensure appropriate collection and tracking of transparency data related to public reports, as discussed in Paragraph 212 of this Agreement.

### H.   Public Statements, Testimony, Records, and Conflicts of Interest

218.   Except as required or authorized by the terms of this Agreement or with the Parties acting together:  the Compliance Evaluator, including any agent, employee, or independent contractor thereof, will not make any public statements or issue findings with regard to any act or omission of the City or SPD, or their agents, representatives, or employees; or disclose non-public information provided to the Compliance Evaluator pursuant to this Agreement. Any press statement anticipated to be made by the Compliance Evaluator regarding its employment or Compliance Evaluation activities under this Agreement must be first approved by DOJ and the City.

219.   The Compliance Evaluator, including any agent, employee, or independent contractor thereof, may testify as to its/their observations, findings, and recommendations before the Court with jurisdiction over this matter.  However, the Compliance Evaluator, including any agent, employee, or independent contractor thereof, will not testify in any other litigation or investigative or pre-litigative proceeding with regard to any act or omission of the City, SPD, or any of their agents, representatives, or employees related to this Agreement or regarding any matter or subject of which the Compliance Evaluator may have received knowledge as a result of their performance under this Agreement.  This paragraph does not apply to any proceeding before a court related to performance of contracts or subcontracts for the Compliance Evaluator services referenced in this Agreement.

220.    Unless such conflict is waived by the Parties, the Compliance Evaluator will not accept employment or provide consulting services that would present a conflict of interest with the Compliance Evaluator's responsibilities under this Agreement.  The Compliance Evaluator will not enter into any contract with the City, SPD, or the United States while serving as the Compliance Evaluator unless the Compliance Evaluator first discloses the potential contract to the Parties and the Parties agree in writing to waive any conflict.

221.    The Compliance Evaluator is not a state or local agency, or an agent thereof, and accordingly, the records maintained by the Compliance Evaluator will not be designated as public records subject to public inspection.

222.    The Compliance Evaluator will not be liable for any claim, lawsuit, or demand arising out of the Compliance Evaluator's performance pursuant to this Agreement brought by non-parties to this Agreement.

**I.      SPD Settlement Agreement Implementation Unit**

223.    Within 60 days of the Effective Date, the City and SPD will create and staff a Settlement Agreement Implementation Unit with the skills and abilities necessary to facilitate compliance with this Agreement.  At a minimum, this unit will coordinate the City's and SPD's compliance and implementation activities; facilitate the provision of data, documents, materials, and access to the City's and SPD's personnel to the Compliance Evaluator and DOJ, as needed; ensure that all data, documents and records are maintained as provided in this Agreement; and assist in assigning implementation and compliance related tasks to SPD personnel, as directed by the Superintendent or the Superintendent's designee.  The unit will consist of at least one SPD or City employee with exceptional organizational and management skills whose main responsibility will be to ensure effective and timely implementation of this Agreement.  Additional skills needed for this unit may include project management, data analysis skills, IT skills, familiarity with police training standards and practices and policy drafting experience.

**J.      SPD Self Assessments and Reporting**

224.    Within 30 days of the Compliance Evaluator's first semi-annual report, the City will file with the Court, with a copy to the Compliance Evaluator and DOJ, a six-month status report.  This report will delineate the steps taken by SPD during the reporting period to comply with this Agreement; SPD's assessment of the status of its progress; plans to correct any problems; and responses to any concerns raised in the Compliance Evaluator's previous semi-

annual report.  Following this initial status report, the City will thereafter file a status report within 30 days of each of the Compliance Evaluator's semi-annual reports until this Agreement is terminated.

225.    After one year from the effective date, SPD will develop a plan to conduct self-assessments of its conduct in each area of this Agreement.  These self-assessments will serve as a means of developing SPD's capacity for organizational accountability.

### K.    Access and Confidentiality

226.    The Compliance Evaluator and DOJ will have timely, full, and direct access to all City and SPD staff, employees, Agreement-related individuals, facilities, trainings, meetings, records from disciplinary hearings, and reviews to the extent they are relevant to the implementation of this Agreement.  DOJ and the City agree that the Compliance Evaluator shall have access to attend and observe the Board of Police Commissioners' hearings, and the City agrees to make due and diligent efforts to negotiate with the unions to ensure that the Compliance Evaluator has full access to these proceedings.

227.    The City and SPD will ensure that the Compliance Evaluator and DOJ will have full and direct access to all City and SPD documents and data related to the Agreement, except any documents or data protected by work product or the attorney-client privilege (together "privilege").  Privilege may not be used to prevent the Compliance Evaluator or DOJ from observing trainings, disciplinary hearings, or reviews, other than reviews with City lawyers in anticipation of litigation or for litigation.  Should the City and SPD decline to provide the Compliance Evaluator or DOJ with access to documents or data based on privilege, the City and SPD will inform the Compliance Evaluator and DOJ that it is withholding documents or data on this basis and will provide the Compliance Evaluator and DOJ with a log describing the documents or data and the basis of the privilege.  If DOJ objects to the City's classification, DOJ may seek resolution of the propriety of the assertion of the privilege from the Court.

228.    The Compliance Evaluator and DOJ will provide the City and SPD with reasonable notice of a request for copies of documents.  Upon such request, the City and SPD will provide copies in a timely manner (electronic, where readily available) of the requested documents to the Compliance Evaluator and DOJ, unless withheld as privileged as described above or otherwise withheld pursuant to law.

229.    The Compliance Evaluator and DOJ will have access to all records and information relating to criminal investigations of SPD officers as permitted by law, and to the extent that the City and the SPD have custody and control of such information.  The Compliance Evaluator and DOJ will have access to all documents in criminal investigation files that have been closed by SPD after the Effective Date.

230.    To facilitate its work, the Compliance Evaluator may conduct on-site visits and assessments without prior notice to the City and SPD. It is expected that such on-site visits will be used sparingly and will be done in a manner which reduces the disruption to the SPD and minimizes costs.

231.    SPD will notify the Compliance Evaluator as soon as practicable, and in any case within 12 hours, of any critical officer-involved shooting, in-custody death, or arrest of any officer.

232.    The Compliance Evaluator and DOJ will maintain all non-public information provided by the City and SPD in a confidential manner.  Other than as expressly provided in this Agreement, this Agreement will not be deemed a waiver of any privilege or right the City, SPD, employees and/or any other individuals or groups may assert, including those recognized at common law or created by statute, rule, or regulation, against any other person or entity with respect to the disclosure of any document.

**L.    Court Jurisdiction, Modification of this Agreement, and Enforcement**

233.    The Court will retain jurisdiction of this action for all purposes until such time as: a) the City and SPD have achieved Substantial and Effective Compliance with this Agreement and maintained such compliance for no less than two consecutive years; and b) the Court issues an order terminating the Agreement.  At all times, the City and SPD will bear the burden of demonstrating by a preponderance of the evidence its Substantial and Effective Compliance with this Agreement.

234.    DOJ may seek an appropriate judicial remedy if it determines that the City and SPD have failed to substantially comply with any provision of this Agreement.  DOJ will consult with officials from the City before instituting enforcement proceedings.

235.    Unless stated otherwise in this Agreement, if either party disagrees with any aspect of implementation, including any policies, procedures, protocols, manuals, training materials, and other administrative orders or directives created or revised in furtherance of this

Agreement, that party will engage in good faith consultation with the other party and the Compliance Evaluator to attempt to resolve the disagreement. If the disagreement persists and if necessary, either party may petition the Court to resolve the dispute.

236.    The City and DOJ may jointly agree to make changes, modifications, and amendments to this Agreement, which will be effective if approved by the Court. Such changes, modifications, and amendments will be encouraged when the Parties agree, or where the Compliance Evaluator's reviews, assessments, and/or audits demonstrate that an Agreement provision as drafted is not furthering the purpose of this Agreement or that there is a preferable alternative that will achieve the same purpose. The Compliance Evaluator can request changes, but changes, modifications and amendments will be made only with the agreement of the Parties and approval of the Court. Where the Parties or the Compliance Evaluator are uncertain whether a change to this Agreement is advisable, the Parties may agree to suspend the current Agreement requirement for a time period agreed upon at the outset of the suspension. During this suspension, the Parties may agree to temporarily utilize an alternative requirement. The Compliance Evaluator will assess whether the suspension of the requirement, and the use of any alternative provision, is as effective, or more effective at achieving the purpose as was the original/current Agreement requirement, and the Parties will consider this assessment in determining whether to jointly stipulate to make the suggested change, modification, or amendment.

237.    The Parties agree to defend the provisions of this Agreement including in collective bargaining and any other matter relating to the Agreement. The Parties will notify each other of any court, union, or administrative challenge to this Agreement. In the event any provision of this Agreement is challenged in any city or state court, the Parties will seek removal to Federal Court. To the extent any state law or collective bargaining provision conflicts with any provision of this Agreement or impedes its effective implementation, the City and SPD will use its best efforts to advocate to change the law(s) or collective bargaining provision(s). This Agreement does not alter or affect current CBAs or collective bargaining rights, or state law. If the City and SPD are unable to eliminate conflicts between the provisions of this Agreement and law(s) or collecting bargaining provision(s), the City and SPD will comply with the Agreement to the extent permissible.

238.    The City and SPD will require compliance with this Agreement by their respective officers, employees, agencies, assigns, or successors.

239.    This Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, arbitral, or administrative action.  Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.

240.    This Agreement does not expand, nor will it be construed to expand, access to any City, SPD, or DOJ documents, except as expressly provided by this Agreement, by persons or entities other than DOJ, the City, SPD, and the Compliance Evaluator.

241.    In the event of any public-records request for drafts of this Agreement or communications among the Parties leading to this Agreement, the Court will maintain continuing jurisdiction over any such request.  Further, the Parties may assert in any action, motion, subpoena, or request for disclosure of information the ongoing applicability of a settlement privilege to all such drafts or communications among the Parties leading to this Agreement.  The assertion of such privilege would be decided by the court with jurisdiction over the action, motion, subpoena, or request for disclosure.

## M.    Termination of this Agreement

242.    This Agreement will terminate when the City has achieved Substantial and Effective Compliance with the provisions of the Agreement and maintained that Substantial and Effective Compliance for two consecutive years.  To initiate the termination of the Agreement, the parties may file a joint motion with the Court at any time upon showing that SPD has achieved Substantial and Effective Compliance and maintained that compliance according to the time periods set forth in Paragraph 244.

243.    It is anticipated that SPD will have achieved Substantial and Effective Compliance and maintained that Substantial and Effective Compliance for two consecutive years within four years of the effective date of the decree.

244.    If the Parties disagree whether the City has maintained Substantial and Effective Compliance with the provisions of the Agreement for two consecutive years, the City may seek to terminate this Agreement.  Prior to filing a motion to terminate, the City agrees to notify DOJ in writing when the City has determined that it is in Substantial and Effective Compliance with this Agreement and that such compliance has been maintained for the required time periods and

will document the basis for its position. Thereafter, the Parties will promptly confer as to the status of compliance, and the Compliance Evaluator and/or DOJ may elect to conduct reasonable audits in response to the City's assertion, including on-site observations, document reviews, or interviews with the City and SPD's personnel.

245.    If, after a reasonable period of consultation and the completion of any audit or evaluation that DOJ and/or the Compliance Evaluator elects to undertake, the Parties cannot resolve any compliance issues, the City may file a motion to terminate this Agreement. If the City moves for termination of this Agreement, DOJ will have 60 days after the receipt of the City's motion to object to the motion.  If DOJ does not object, the Court may grant the City's motion without a hearing.  If DOJ does object, the Court will hold a hearing on the motion, and the burden will be on the City to demonstrate by the preponderance of the evidence that it is in Substantial and Effective Compliance with this Agreement and has maintained such compliance for two consecutive years.

246.    Subsections of this Agreement may be terminated separately and independently from the provisions of the Agreement that have not yet reached Substantial and Effective Compliance if the City maintains Substantial and Effective Compliance in these areas for a period of two consecutive years.  In such circumstances, the Compliance Evaluating team shall be released from conducting compliance reviews of those subsections once Substantial and Effective Compliance has been maintained for two consecutive years.

247.    The Court shall conduct a hearing four years after the effective date of the decree to assess the City's overall progress on achieving and maintaining Substantial and Effective Compliance with the decree.  At this hearing, the City may provide evidence to the Court of the progress it has made.  The Parties jointly, or the City separately, may indicate at the hearing an intention to move for termination of the decree, in whole or in part, pursuant to the provisions of Paragraphs 244 – 246.  If the Parties anticipate that the City's implementation efforts will continue after the hearing, the Parties shall be prepared to describe for the Court at the hearing the work that remains for the City to achieve and maintain Substantial and Effective Compliance with the decree and anticipated timeframes for completing this work.

## XI.    DEFINITIONS AND ABBREVIATIONS

248.    "Administrative Inquiry" means review of a complaint by a supervisor in the involved officer's chain of command and is appropriate where a complaint on its face does not indicate officer misconduct.

249.    "Board of Police Commissioners" means the body created by the City of Springfield ordinance whose public purpose shall include the discipline of such members and employees of the Police Department, as it deems wise and proper, and to conduct disciplinary hearings and determine conditions of discipline, termination and reappointment where warranted. The Board will have final say on all disciplinary matters on all cases received pursuant to paragraph 109 and any other case the Superintendent designates as it performs an oversight function for the department, but not the daily managerial function as performed by the Superintendent of Police.

250.    "Body-worn camera" or "BWC" means audio and/or video recording equipment that is worn affixed to an officer's person, uniform, or equipment, with the capability of capturing, recording, and storing information for later viewing.

251.    "Chokehold" means  any action that involves the placement of any part of an officer's body on or around a person's neck with the intent to limit the person's breathing or blood flow, including (a) arm-bar control holds, which inhibit breathing by compression of the airway in the neck; (b) carotid restraint holds, which inhibit blood flow by compression of the blood vessels in the neck; (c) lateral vascular neck constraints; and (d) holds with a knee or object to the back of a prone subject's neck.

252.     "Compliance Evaluator" means a person or team of people who will be jointly selected to Compliance Evaluator and report on the implementation of this Agreement.

253.    "City" means the City of Springfield, MA including its agents, officers, and employees.

254.    "Command staff" means officers at the rank of captain and above.

255.    "Complainant" means any person who makes a complaint against SPD or an officer or employee of SPD.

256.    "Days" means calendar days unless otherwise modified.

257.    "De-escalation techniques" means tactics used by officers during encounters to minimize the need to use force and increase the likelihood of voluntary compliance.  These may

include verbal persuasion and warnings, as well as tactical de-escalation techniques such as creating space, slowing down the pace of an incident, and requesting additional resources.

258.    "Demographic category" means race, ethnicity, national origin, age, gender, gender expression or identity, sexual orientation, disability, religion, or limited English proficiency.

259.    "Department of Justice" or "DOJ" refers jointly to the United States Department of Justice's Civil Rights Division and the United States Attorney's Office for the District of Massachusetts.

260.    "Discipline" means a personnel action for violation of an established law, regulation, rule, administrative rule, or SPD policy, including a written reprimand, suspension, or dismissal.

261.    "Effective Date" means the day this Agreement is approved.

262.    "EIS" means the Early Intervention System.  An EIS system is a data-based management tool designed to identify officers whose performance exhibits potential problems, and then to provide interventions, including but not limited to counseling and training, to correct those potential performance problems.

263.    "Firearms Investigation Unit" means the SPD unit created to reduce gun violence in Springfield.  The Firearms Investigation Unit replaces SPD's Narcotics Bureau, which has been disbanded.  SPD no longer has a specific departmental unit that focuses on drug-related laws.

264.    "Force" means any physical effort used to compel compliance, control or restrain another, or to overcome the resistance of another.

265.    "Force Investigation Team" or "FIT" means a group of SPD supervisors, tasked with conducting investigations of Level 4 and 5 Force and investigations specially assigned to FIT by the Police Superintendent or designee. The supervisors shall not be involved in any way in the underlying incident.  Where possible, the supervisors also shall not be a part of the officer's chain of command.

266.    "IIU" means the Internal Investigations Unit.

267.    "Implement" or "implementation" means the putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and

verified performance of that policy or procedure in actual practice through the regular use of audit tools.

268.   "Including" means "including, but not limited to."

269.   "Injury" means bodily harm beyond mere transient physical pain.

270.   "LEP" means Limited English Proficient and refers to a person who does not speak English as his/her primary language and has a limited ability to read, write, speak, or understand English. LEP individuals may be competent in certain types of communication (e.g., speaking or understanding), but still be LEP for other purposes (e.g., reading or writing).

271.   "Level 1" references cooperative control tactics used with a non-resistant subject, such as unresisted handcuffing, hand control or escort techniques (e.g., elbow grasp) and does not constitute a use of force.

272.   "Level 2 Force" includes (1) uses of force such as a wrist lock, arm bar, and the single use of OC spray, where there is no reported or observed injury beyond the level of discomfort commonly associated with the use of OC spray, however in the event of a single use of OC spray, all available body worn camera footage will be tagged and investigated within 72 hours (2) pointing a firearm or Conducted Electrical Weapon ("CEW") at an individual; (3) "cycling" a CEW as a form of warning ("Displaying the Arc"); (4) pressure point compliance techniques that do not result in injury; and (5) forcible takedowns that do not result in actual injury or complaint of injury. It does not include escorting, touching, or handcuffing a person with minimal or no resistance.

273.   "Level 3 Force" means an intermediate use of force that causes or could reasonably be expected to cause an injury greater than transitory pain but does not rise to a Level 4 or 5 use of force.  Level 3 may include uses of force such as (1) the use of OC spray if there is an injury reported or observed, or if OC spray is used more than once on the same individual; and (2) pressure point compliance techniques that do result in injury.

274.   "Level 4 Force" means a serious level of force including (1) any discharge of a CEW in drive-stun or probe mode, aimed at a person, that is not Level 2 or 3 Force, including where a CEW is fired at a person but misses;  (2) weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks); (3) any discharge of a less-lethal launcher/munition; (4) any canine inflicted injury, except those that would otherwise constitute Level 3 Force; (5) any strike, other

than a strike with an impact weapon, to the head, neck, sternum, spine, groin, or kidney area; (6) any striking of a vehicle or subject with a vehicle that does not rise to a Level 5 Force.

275.    "Level 5 Force" means the most serious level of force, to include (1) strikes to the head, neck, sternum, spine, groin, or kidney area with an impact weapon; (2) weaponless defense techniques (e.g., elbow or closed-fist strikes, kicks) directed at the head, neck, sternum, spine, groin, or kidney area that results in visible injury, and/or requires medical attention, and/or results in complaint of injury; (3) firearm discharges, including unintentional firearm discharges; (4) applications of three or more CEW cycles on an individual during a single encounter regardless of the mode (probe or drive stun) or duration of the application, and regardless of whether the applications are by the same or different officers; (5) uses of force resulting in death, serious physical injury, loss of consciousness or requiring hospitalization; and (6) uses of lethal force.

276.    "Misconduct" means a violation of SPD policies or procedures; violation of federal, state, or local criminal or applicable civil laws; constitutional violation, whether criminal or civil; violation of administrative rules; or violation of regulations.

277.    "Patrol sector" refers to one of the patrol service areas of SPD, which together cover the entire geographic area of the City of Springfield.

278.    "Personnel" means all SPD employees.

279.    "PIE" means Preliminary Investigation of Employee, which is an internal referral for officer misconduct that is of a less serious nature and handled by supervisory officers. A PIE is appropriate where a citizen's complaint alleges rudeness or minor violations of SPD Rules and Regulations.

280.    "Police officer" or "officer" means any sworn law enforcement agent employed by or volunteering for SPD, including supervisors and reserve officers.

281.    "Policies and procedures" means written regulations or directives, regardless of the name of the regulation or directive, describing the duties, functions, and obligations of SPD personnel, and providing specific direction on how to fulfill those duties, functions, or obligations.  These include general orders, special orders, policies, procedures, and standard operating procedures.

282.    "Reasonable force" means force which is objectively reasonable under the circumstances and the minimum amount of force necessary to effect an arrest or protect the officer or other person.

283.    "SO" means Special Order, which is a complaint or internal referral for officer misconduct that is of a serious nature and handled by IIU.  Allegations of serious misconduct include the use of excessive force, corrupt acts, or an alleged violation of a citizen's constitutional.  SOs are also appropriate when there is a custodial death of a prisoner, officer involved shooting, or departmental vehicle pursuit that results in death or serious bodily injury.

284.    "Source of complaint" means whether the complaint comes from an internal (department) or external (public member) source.

285.    "SPD" refers to the Springfield Police Department and its agents, officers, supervisors, and employees (both sworn and unsworn).

286.    "Substantial and Effective Compliance" means that the City either has complied with all material requirements of this Agreement or has achieved sustained and continuing improvement in constitutional policing, as demonstrated pursuant to this Agreement's outcome measures.   Material Requirements of this agreement means all policies and trainings called for herein have been completed, the audits conducted herein confirm the completion, and the changes have been carried out in actual practice.

287.    "Superintendent" shall mean the Superintendent of Police, appointed by the Mayor, who shall have the day-to-day oversight of the Police Department.  The superintendent's authority will include 'command and control' of all department members, professional standards, as well as hiring, promotions, and assignments, and all administrative, budgetary and managerial functions of the SPD, and the authority to suspend an employee for just cause for a period of five days or less without a hearing prior to such suspension.

288.    "Supervisor" means sworn SPD personnel at the rank of sergeant or above (or anyone acting in those capacities) and non-sworn SPD personnel with oversight responsibility for other personnel.

289.    "Type of complaint" means complaint allegation.

290.    "Unit" means a designated SPD law enforcement component with specialized skills and mission.

291.    "Unity of Command." The principle that all officers are assigned to a consistent, clearly identified first-line supervisor and that first-line supervisors are assigned to work the same days and hours as the officers they are assigned to supervise to the extent possible.

292.    "Use of Force Committee" or "UFC" means an SPD group of individuals that assists in reviewing Level 2, 3, 4, and 5 use of force reports, including FIT investigations.

293.    "Will" or "shall" or "agrees to" means that the provision imposes a mandatory duty.

FOR THE UNITED STATES:

RACHAEL S. ROLLINS
United States Attorney
District of Massachusetts


JENNIFER A. SERAFYN
Chief, Civil Rights Unit
District of Massachusetts




MICHELLE LEUNG, BBO #568624
TOREY B. CUMMINGS
Assistant U.S. Attorneys
District of Massachusetts
John Joseph Moakley Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3626
Michelle.Leung@usdoj.gov
Torey.Cummings@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division


STEVEN H. ROSENBAUM
Chief, Special Litigation Section


PAUL KILLEBREW
Deputy Chief, Special Litigation Section


F. NICOLE PORTER
ARIONA JEAN-JOHNSON
Trial Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-6255
Nicole.Porter@usdoj.gov
Ariona.Jean-Johnson@usdoj.gov

FOR THE CITY OF SPRINGFIELD AND THE SPRINGFIELD POLICE DEPARTMENT:

DOMENIC J. SARNO
Mayor

JOHN PAYNE
City Solicitor

CHERYL C. CLAPPROOD
Superintendent
Springfield Police Department