

# COMPLIANCE EVALUATOR REPORT

December 2025

O'Toole Associates, LLC
www.spdcomplianceteam.com

Compliance Evaluator Report | December 2025

# Table of Contents

**Lead Compliance Evaluator Message**

**Outstanding Requirements and Commentary**

**Conclusion**

**Appendix**

    A. Compliance Evaluator Team Biographies
    B. The Settlement Agreement

## Lead Compliance Evaluator Message

On behalf of the Compliance Evaluator Team ("CET"), I am pleased to present this bi-annual report related to the Settlement Agreement between the United States Department of Justice ("DOJ") and the City of Springfield, MA ("City") filed on April 13, 2022.

As in each of our previous assessments, I want to begin by acknowledging the sustained effort, cooperation, and commitment demonstrated by City leadership, the Springfield Police Department ("SPD"), and the many personnel who have remained deeply engaged in this reform process. Over the course of our work together, we have consistently noted the City's earnest approach to meeting the obligations of the Agreement and its willingness to adapt, improve, and invest in long-term change. The support provided by those remaining on the DOJ team has also been invaluable. Our team continues to be heartened by the enthusiastic participation of Springfield community members in the process as well.

This report departs in structure and purpose from prior iterations. With the April 2026 target for completion approaching, this assessment is designed to provide a sharper, more focused lens on the specific requirements that remain outstanding. While previous reports documented progress comprehensively, this edition concentrates almost exclusively on those provisions where work is still required. Our intention is to offer the City and SPD a clear, concise, and practical roadmap for completing all remaining obligations within the timeframe originally envisioned.

The Settlement Agreement is a lengthy document containing 293 paragraphs. In this report, the CET focuses on the twenty-one paragraphs that we believe require additional attention of the parties between now and April 2026. By narrowing our focus in this manner, we aim to ensure that leadership has the benefit of direct, actionable guidance and that the final months of implementation are organized around well-defined, achievable objectives. The City has demonstrated repeatedly that it possesses both the capacity and the commitment to finish this work. This report is intended to support that final stretch and to help ensure that Springfield emerges from this process with durable systems, strengthened accountability, and improved public trust.

We look forward to continuing our collaboration with the City of Springfield, SPD, DOJ and community representatives as they work to complete the remaining requirements and solidify the substantial progress made to date.

Respectfully,

*Kathleen O'Toole*

Kathleen O'Toole

## Outstanding Requirements and Commentary

The CET urges the City and SPD to focus on the following Settlement Agreement requirements. To provide context, specific Settlement Agreement paragraphs precede CET commentary which is provided in bold.

**Paragraph 19**: The City and SPD agree to continually revise their current force policies, training, reporting, and review mechanisms to ensure that SPD officers only use force in a manner consistent with the Constitution and laws of the United States, and the requirements of the Agreement, and that any unreasonable uses of force are identified and responded to appropriately. These policies shall be developed and implemented within six months of the Effective Date.

**The City and SPD have made considerable progress related to this paragraph.  Use of Force policies have been revised, quality training has been designed and offered, and reporting and review have improved significantly.  Nonetheless, the CET has occasionally identified concerns when reviewing case files.  SPD is required to identify and respond appropriately to unreasonable uses of force.**

**There are four levels of reportable force in SPD policy – Levels Two through Five.  Level Two includes force such as a wrist lock, arm bar, and single use of OC spray, where there is no reported or observed injury beyond discomfort commonly associated with OC spray.  It also includes pointing a firearm or CEW at an individual, cycling a CEW as a form of warning, and pressure point techniques and forcible takedowns, again, that do not result in injury or complaint of injury.  Level Three force causes or could reasonably cause transitory pain and may include force such as the use of OC spray if there is a reported or observed injury or if the OC is applied more than once to the same individual.  Pressure point compliance that causes injury or complaint of injury would also be Level Three.  More significant uses of force including CEW discharges, punches, kicks, and canine injuries fall into Level Four and the most serious, including deadly force, are Level Five.**

**The focus of DOJ's investigation in this matter was the former SPD Narcotics Unit, eventually renamed Firearms Investigations Unit ("FIU").  Twenty-four personnel are assigned to the unit.  The unit made a total of 435 arrests in 2023 and 352 arrests in 2024.  In 2024, they were involved in seventeen use of force incidents, fourteen at Level Two and three at Level Three.**

**From January 1, 2025, to Nov 10, 2025, FIU applied force in twenty-four incidents – seventeen Level 2 and seven Level 3.  When reviewing 2025 FIU force cases, the CET identified three incidents that prompted follow-up with SPD.  The first was resolved when FIU supervisors provided additional detail not in the original documentation which showed the force was, in fact, reasonable.  When closely examining the second case, the force appeared to be accidental and did not result in injury.  The third issue discussed with SPD involved a FIU officer who escalated rather than deescalated the situation in multiple cases.  The SPD**

**acknowledged the feedback and committed to addressing that concern. In cases reviewed, the CET noted that FIU supervisors and commanders are doing a better job of identifying issues and counselling officers, but there is not always clear documentation of supervisors' actions.**

**The CET will continue to review cases and meet regularly with FIU supervisors to provide feedback.  Ultimately, the CET must be able to validate that the increased efforts have led to desired, sustained change.**

**Paragraph 20**: When possible, SPD officers shall use advisements, warnings, and verbal persuasion, before resorting to force; including identifying themselves as SPD officers before using force and, where practicable, giving individuals an opportunity to comply with verbal commands before using force. This opportunity should be given when such delay will not compromise the safety of the officer or another, and will not result in the destruction of evidence, escape of a suspect, or commission of a crime.

**During review of cases, the CET has noted several good examples of deescalation.  In one instance, a fellow officer intervened by pushing a colleague away in an emotionally charged incident.  As noted above, however, the CET reviewed two incidents where an FIU officer escalated the situation inappropriately.  The SPD assured the CET that further action will be taken to counsel and train that officer.  It is important for SPD to demonstrate that such behavior will be identified, appropriately addressed, and documented.**

**Paragraph 41**: Consistent with the Massachusetts General Law Chapter 276 process, the booking sergeant will ensure that there are photographs of prisoners' injuries. If a prisoner is injured or alleges that an officer used unreasonable force, the booking sergeant shall gather as much information as possible from the prisoner about the circumstances surrounding the use of force, including, for example, which officer used force, what kind of force was used, and the circumstances that led up to the use of force. If the force as alleged was a Level 3, 4, or 5 use of force, or any level of force which necessitates medical attention at a local hospital, the booking sergeant shall ensure that the appropriate personnel conduct an investigation of the force used. The booking sergeant shall additionally report all complaints of unreasonable uses of force to the Internal Investigations Unit ("IIU") and to the Superintendent's office. The booking sergeant need not interview the subject if they have already been interviewed by someone else, including a Force Investigation Team ("FIT")-trained supervisor.

**In Use of Force cases, it is important for booking sergeants (or another supervisor if appropriate) to get statements from subjects.  The CET has not seen evidence that this is done routinely.**

**Paragraph 44**: Whenever a supervisor uses, directs, or is otherwise personally involved in any type of force, the investigation will be conducted by a supervisor uninvolved, at a higher rank than the officer who used the force.

5

**In one case reviewed by the CET, a sergeant conducted the investigation of a Use of Force incident involving a lieutenant. Training must reinforce that a force investigation must be conducted by an uninvolved supervisor at a higher rank than the officer(s) involved.**

**Paragraph 45**: SPD will ensure that Level 2, 3, 4, and 5 uses of force are appropriately and thoroughly reviewed to identify unlawful conduct, policy violations, and tactical needs. Every supervisor in the chain of command is responsible for the accuracy and completeness of the use of force review completed by supervisors, and for initiating corrective action if necessary. SPD will ensure that whenever a supervisor uses, directs, or is otherwise personally involved in any type of use of force, including participating in the tactical planning that led to the use of force, an uninvolved supervisor, of a higher rank, who was not involved in the incident will review the use of force. The Superintendent or his/her designee may, in their discretion, reassign a review of force of any level to a FIT-trained supervisor.

**The CET has seen great progress in review of recent cases. Supervisors have identified most issues requiring feedback and have addressed them. This trend has been encouraging. The CET will continue to monitor to ensure this level of review is sustained.**

**Paragraph 54**: The first commander in the chain of command who reviews the uninvolved supervisor's use of force review of Level 2 force will ensure that the review is thorough, complete, makes the necessary and appropriate findings of whether the use of force was consistent with SPD policy; and whether there are tactical, equipment, or policy considerations that need to be addressed. The involved officer's sergeant will ordinarily be the final reviewer of Level 2 uses of force.

**Like Paragraph 45, the CET has been very pleased in its review of recent cases. It will pay close attention to ensure this trend continues.**

**Paragraph 56**: Upon notification of a Level 3 or 4 use of force, an uninvolved supervisor of the officer(s) using force will respond to the scene.

**The City has developed a protocol for Detective Bureau response, but the process should be memorialized.**

**Paragraph 57-a**: SPD will ensure that upon arrival at the scene, the uninvolved supervisor will identify and collect information sufficient to establish the material facts related to the Level 3 or 4 use of force, including the following information: a. Locate relevant civilian witnesses including the subject and third parties and arrange for those witnesses to be interviewed. Interviewing of witnesses will be coordinated with the Detective Bureau officers as set out in paragraph 42 herein. Witnesses need not be interviewed at the scene, but sufficient information to allow identifying and contacting witnesses should be gathered.

**In review of FIU cases, the CET has not seen evidence of witness interviews. It has observed witnesses in video but seen no evidence of actual witness interviews. Also, it has not**

**observed attempts to interview subjects of force about circumstances surrounding the use of force. The interviews seen have been focused almost exclusively on injuries. The chain of command must be properly informed and trained to address this requirement. SPD has indicated this issue will be covered in upcoming training.**

**Paragraph 58**: All Level 3 and 4 uses of force will be thoroughly reviewed by an uninvolved supervisor above the rank of the involved officer. The supervisor conducting the use of force review will evaluate in writing all uses of force for compliance with SPD policy, as well as any other relevant concerns (e.g., tactical or threat assessment). The supervisor should provide timely, constructive feedback, where appropriate.

**The CET noted recent progress relative to these requirements – like progress noted for paragraphs 45 and 54. The CET will review future cases to ensure continued improvement and sustainment.**

**Paragraphs 63-67**:

63. SPD will ensure that a FIT-trained supervisor will respond to and investigate all
Level 5 use of force incidents; and any other incident as deemed appropriate by the Police Superintendent or their designee.

64. To guide FIT practices and investigations, within one year of the Effective Date, SPD will develop and implement a FIT training curriculum and procedural manual. The manual shall address the coordination of efforts between the Detective Bureau, or other SPD personnel, and FIT-trained supervisors regarding the collection of evidence, witness interviews, and any other investigative duties. The manual shall also make clear that Detective Bureau investigators will have priority access to witnesses and evidence at the scene. Within eighteen months of the Effective Date, SPD will train selected supervisors and other personnel on the manual and related FIT procedures.

65. FIT will consist of supervisor level personnel who undergo the training enumerated in Paragraph 64, above. The member of this team will investigate use of force incidents as set out herein. It is not expected that FIT investigations will comprise any supervisor's full-time work. Rather, these supervisors will collectively be responsible for discharging the obligations relative to use of force investigations as set out herein.

66. The FIT-trained supervisor who responds to the use of force will lead all investigative activity regarding the use of force, which includes locating and interviewing witnesses, securing the scene and evidence, locating video surveillance that may have captured the incident, and making notifications. The FIT-trained supervisor will work cooperatively with any other department or division or outside personnel investigating underlying criminal activity at the scene, whether such criminal activity relates to the SPD officer's use of force or not, and will

make every effort to avoid activities which compromise, impede, or otherwise disrupt the criminal investigation at the scene of the use of force.

67. FIT will have the following responsibilities in responding to a Level 5 use of force incident subject to the provisions of paragraph 42 contained herein:
    a. FIT-trained supervisor will assume control of the use of force investigation upon their arrival;
    b. FIT-trained supervisor will record all interviews with civilian witnesses. If a civilian witness refuses to be recorded, the FIT-trained supervisor will document the refusal and take a written statement from the witness. If recorded interviews of witnesses are being done by other SPD personnel, the FIT-trained supervisor will have access to such interview recordings and can rely on those to lessen the number of interviews a witness is subjected to;
    c. FIT-trained supervisor will ensure that the Shift Commander has separated all officers involved in, or who witnessed, a use of force incident until they are all interviewed; If it is not possible to separate all officers until they can be interviewed, they will be admonished to not confer, discuss or review the use of force incident with others until they are able to be interviewed;
    d. FIT-trained supervisor will ensure all video evidence is immediately gathered and assessed; this obligation can be discharged by assuring that other SPD personnel have secured this evidence;
    e. The FIT-trained supervisor will arrange for a crime lab technician to process the scene and provide photos as soon as practicable to FIT; this obligation can be discharged by assuring that other SPD personnel have secured this evidence;
    f. FIT-trained supervisor will attempt to interview the person upon whom the officer used the Level 5 use of force to obtain the person's account of what happened, if possible, as an audio-recorded interview. They will also photograph or arrange to have photographed areas of injury or complaint of injury; this obligation can be discharged by assuring that other SPD personnel have secured this evidence;
    g. The FIT-trained supervisor responding to the scene will review body-worn camera or other video which may have recorded all or part of the incident and describe in the force report what the video shows; this need not be done at the scene but within a reasonable time thereafter;
    h. FIT-trained supervisor will seek to obtain voluntary statements from all involved officers. All interviews with officers must be recorded (audio and/or video) and take place as soon as practical. To the extent this requires modification to various involved union contracts, the City agrees to make do and diligent efforts to negotiate such modifications in accordance with this paragraph;
    i. The FIT-trained supervisor responding to the scene will arrange for the involved officers to submit use of force written reports as soon as practicable and no later than 24 hours after the incident, except in extenuating circumstances, such as when an officer is injured, in which case the officer will submit their written report as soon as the extenuating circumstance allows;

 j. FIT-trained supervisor will be responsible for notifying the involved officer's commanding officer, the Police Superintendent, and Deputy Chiefs no later than 24 hours after learning of the Level 5 use of force, unless impractical. This notification will contain basic facts about the incident as they are known at the time;
 k. FIT-trained supervisor will complete their investigation within 60 days or as soon as possible thereafter; and
 l. If the FIT-trained supervisor uncovers potential administrative misconduct at any point in the investigation, the FIT-trained supervisor will notify the Captain of IIU and the Superintendent's office. If FIT uncovers potential criminal conduct at any point in the investigation, the FIT-trained independent supervisor will notify the Superintendent's office who will in turn authorize notifying the appropriate prosecuting authority and providing all relevant information.

**SPD has not met the requirements in sections 63-67. They have indicated supervisors have been selected for FIT, but the CET is unaware of any additional progress. It is imperative for SPD to focus now on the numerous, important requirements in these paragraphs.**

**Paragraph 76**: Within 30 days of their assignment to the Firearms Investigations Unit ("FIU"), SPD will also provide FIU officers with four hours of training that focuses on the circumstances encountered by FIU officers given their particularized assignment, and available tactics for avoiding unnecessary uses of force in those encounters.

**SPD has indicated that training is being developed for new members of FIU, but the CET has not seen documented evidence of such training.**

**Paragraph 100**: All investigations of SPD misconduct complaints, including all supervisory reviews of the completed investigation, shall be as thorough as necessary to reach reliable and complete findings. SPD shall ensure that, in all investigations involving uses of force, IIU investigators make thorough efforts to find and interview witnesses, exhaust all leads, and fully analyze all of the information available in force investigations. Specifically:
 a. All witnesses, including officers witnessing or involved in an incident that becomes the subject of a personnel complaint, shall provide a written statement regarding the incident or be interviewed as described below;
 b. IIU interviews will be audio-recorded. To the extent this requires modification to various involved union contracts, the City agrees to make do and diligent efforts to negotiate such modifications in accordance with this paragraph. If a civilian refuses to submit to a recorded interview, the IIU investigator will document the refusal and take a written statement from the witness;
 c. SPD shall investigate every allegation of misconduct that arises during an investigation even if an allegation is not specifically articulated as such by the complainant;

    d. Investigators will report and analyze all relevant evidence, including circumstantial, direct and physical evidence, as appropriate;
    e. IIU reports shall clearly set forth each and every allegation of misconduct, the SPD policy or policies that governs each allegation of misconduct, and the evidence the investigation uncovered that bears on each allegation of misconduct; and
    f. IIU reports shall be well-organized, not repetitive, clear, and easy to review and understand.

**SPD has not completed all the steps required. For instance, efforts have not always been made to locate and interview all known witnesses. Allegations discovered during investigations have not been consistently investigated. Some interviews have not obtained thorough accounts of incidents from those interviewed.**

**Paragraph 113**: SPD will provide comprehensive training to IIU investigators about proper complaint intake, investigation, and report-writing techniques. This training shall be provided to officers upon assignment to IIU, and IIU investigators shall receive refresher trainings each year. The training shall occur within one year of the Effective Date. The training shall include instruction in:
    a. Investigative skills, including proper interrogation and interview techniques, gathering and objectively analyzing evidence, and data and case management;
    b. The particular challenges of personnel complaint reviews/investigations, including identifying alleged misconduct that is not clearly stated in the complaint or that becomes apparent during the investigation, properly weighing credibility of witnesses, using objective evidence to resolve inconsistent statements, and the proper application of the preponderance of the evidence standard;
    c. Relevant state, local, and federal law, including state employment law related to sworn officers and the rights of public employees, as well as criminal discovery rules such as those set out in *Garrity v. New Jersey*, 385 U.S. 493 (1967), and *Brady v. Maryland*, 373 U. S. 83(1963); and
    d. SPD rules and policies, including the requirements of this Agreement, and protocols related to criminal and IIU investigations of alleged misconduct.

**The CET reviewed and approved IIU refresher training that took place in Fall 2024. We have not heard or seen an IIU training plan for 2025. Ongoing, robust training is essential for this unit.**

**Paragraph 137:** Within 90 days of the development of the protocol, and semi-annually thereafter, the Data Analysis and Collection Coordinator, working with the Superintendent and UFC, will analyze the prior six month's force data, including the force related data above, to determine if there is any underreporting is occurring; assess any officer-specific, bureau or unit-specific, and department-wide trends; and identify and correct deficiencies revealed by this analysis. The analysis will include reviews of FIT and other force investigations; UFC determinations and recommendations; force reporting; officer injury reports and incidents in which medical assistance was requested or provided following a use of force; and complaints

alleging unreasonable use of force.  The audit will particularly identify and underreporting of force within the FIU and conduct cross-officer comparisons of the use of force rate within the FIU.  SPD will document its findings in a public report to be published on the City's website.

**The City and SPD must meet their ongoing obligations for data assessments and public posting of data. Although a 2024 UOF Annual Report was posted on SPD's website, it does not address all the requirements in this paragraph. Also, it appears no reports have been prepared in 2025.**

**Paragraph 138:**  SPD shall conduct a semi-annual audit of IIU's complaint intake, classification, investigations, credibility determinations, and recommendations (per paragraphs 86-111) related to use of force and document its findings in a public report to be published on the City's website.  The audit will include an assessment of the number, type, and source (i.e. internal or external) of complaints received, the disposition of complaints by type and source, and the average length of complaint investigation and disposition.

**There is no data regarding IIU's work as required by 138. This transparency will be important to maintain public trust and for SPD to highlight that they are self-evaluating going forward.**

**Paragraph 150**: SPD will ensure that first-line supervisors provide close and effective supervision of officers. This close and effective supervision includes responding to, investigating, reviewing, and documenting force as required by this Agreement; monitoring, commanding, and controlling incidents and calls for service; reviewing arrest reports for compliance with law and this Agreement; identifying training and professional development needs; and providing leadership, counseling, redirection, and support to officers as needed.

**As noted in previous paragraphs, the CET has observed much progress.  When reviewing UOF and IIU cases, the CET has seen clear evidence that supervisors across the organization, including those in FIU, have improved significantly in their investigations, reviews, and documentation of force.  Training and professional development opportunities have been offered.  Counseling and support are evident and systems have been developed to document that activity. The SPD is certainly on the right path.  The CET will continue to monitor.**

**Paragraph 171:**   At a minimum, SPD's body-worn camera protocols will: clearly state which officers are required to use body-worn cameras and under which circumstances; require officers to document the existence of any body-worn camera footage on all required reports; mandate that officers report to their supervisors and articulate in writing their reasons for failing to record an activity that SPD policy otherwise requires to be recorded, require officers to inform subjects that they are being recorded unless doing so would be unsafe, impractical, or impossible; and establish a protocol governing the download, supervisory review, and retention of body-worn camera recording that is consistent with best practices.

**SPD has implemented the required body-worn camera protocols, but the CET has seen failures to activate in a timely manner, personnel at scenes not wearing cameras, and failures to notify people that they are being recorded.**

**Paragraph 172:**  Officers will be subject to the disciplinary process for intentional or otherwise unjustified failure to activate body-worn cameras in violation of SPD policy.

**In more than half of the FIU use of force incidents reviewed this year, the CET observed late activation or no activation of body-worn camera by some personnel.  The CET identified only one documented instance in which discipline was applied for failure to comply with policy.**

**Paragraph 225**: (Summary) One year after the Effective Date of the Agreement, SPD must develop a plan to conduct internal self-assessments in each area covered by the Agreement, to build organizational capacity for accountability and continuous improvement.

**The Professional Standards Unit has worked tirelessly to address the requirements of the Settlement Agreement.  Each year the unit has expanded and it recently assumed the additional responsibility of overseeing all training.  The Superintendent has indicated that the unit will remain in place indefinitely to ensure that SPD policies, training, and practices align with Constitutional policing and best practices.**

**The City Solicitor's Office has provided excellent support to the Board of Police Commissioners (BPC) and the Internal Investigations Unit (IIU).  The City Solicitor has agreed that his office will remain responsible for policies, training, and other issues related to BPC and IIU.**

**The Professional Standards Unit and the City Solicitor's office should memorialize their processes for assessments of SPD's force, training, and accountability.**

## CONCLUSION

As the City of Springfield and the Springfield Police Department enter the final stages of implementing the Settlement Agreement, the path forward is both clear and achievable. The progress made to date—reflected in strengthened policies, improved supervisory practices, enhanced training, and a growing culture of accountability—demonstrates the City's capacity and commitment to lasting reform. This report has intentionally concentrated on the requirements that remain outstanding, not to diminish the City's accomplishments, but to provide a precise roadmap for the work that must be completed in the months ahead.

Meeting the April 2026 target will require focused effort, sustained leadership engagement, and close supervision to reinforce the improvements already underway. Several areas, including FIT implementation, witness identification and interviewing practices, IIU training and investigative standards, and formalization of long-term accountability structures, require

immediate and deliberate attention. The CET remains confident that with continued dedication—and with the support already demonstrated by SPD leadership, City officials, DOJ partners, and Springfield community members—these remaining obligations can be met successfully.

The goal is not merely to satisfy the letter of the Agreement, but to ensure that Springfield emerges from this process with durable systems that support constitutional policing, enhance public trust, and contribute to a safer, stronger community. The CET looks forward to continued collaboration during this final phase and stands ready to support the City and SPD as they work to complete this important undertaking.

APPENDIX A

# Compliance Evaluator Team

Members of the CET welcome opportunities to engage with representatives of the parties and the Springfield community.  For those we have not met in person or during virtual community meetings, the biographies below should provide an overview of our diverse experience in modern policing.



## Kathleen M. O'Toole | Lead Compliance Evaluator

O'Toole is a lawyer and career police officer who has earned an international reputation for her principled leadership and reform efforts. She currently serves as president of O'Toole Associates, LLC and as a partner at 21st Century Policing Solutions.

In 2018, O'Toole completed her service as Chief of Police in Seattle, Washington where she led the Seattle Police Department through a major transformation project. In addition to addressing the requirements of a settlement agreement between the US Department of Justice and the City, she introduced leading-edge business practices and operational strategies that reduced crime and enhanced community trust.

O'Toole also chaired the Commission on the Future of Policing in Ireland. In September 2018, the Commission presented its findings and recommendations for sweeping reforms to An Garda Síochána, the Irish national police service. She had previously served a six-year term as Chief Inspector of the Garda Síochána Inspectorate, an oversight body responsible for advising the Irish Minister of Justice and recommending best practices for policing and security.

Earlier in her career, O'Toole rose through the ranks of local and state policing in Massachusetts. She began her career as a beat cop in the Boston Police Department and was assigned to numerous patrol, investigative, undercover, supervisory and management positions. She served as Superintendent (Chief) of the Metropolitan District Commission Police and Lieutenant Colonel overseeing Special Operations in the Massachusetts State Police. She was later appointed Massachusetts Secretary of Public Safety and Boston Police Commissioner.

O'Toole has worked on other high-profile reform projects. In 1998-1999, she was a member of the Independent Commission on Policing in Northern Ireland (The Patten Commission). The Commission published recommendations that transformed policing there as part of the Peace Process. In 2009, she served on a four-person panel that created the blueprint for reforming the Northern Ireland Prison Service. She was a member of the Independent Commission on Policing in England and Wales that published findings in late 2013. She also served as Joint Compliance Expert overseeing an agreement between the US Department of Justice and the Town of East Haven, CT to ensure constitutional policing. She continues to serve as a consultant to several federal, state and local government agencies.

O'Toole earned a BA from Boston College, JD from New England School of Law, and PhD from the Business School of Trinity College Dublin. She is a life member and served on the board of directors of the International Association of Chiefs of Police. She also served as a board member and treasurer of the Police Executive Research Forum.



### Rodney D. Monroe | Compliance Evaluator

Retired Chief Rodney Monroe is an accomplished and highly respected subject matter expert in community policing and police reform. With over 40 years of experience in law enforcement, retiring as Assistant Chief of Police in Washington, D.C., and continuing to serve as Chief of Police for 15 years in three cities, he is now sharing valuable knowledge and expertise with various law enforcement entities.

Under his leadership as Chief of Police in Charlotte, NC, Richmond, VA, and Macon, GA, historical reductions in violent crime were reached. These departments also experienced a significant increase in police and community relationships through the development and implementation of innovative programs and engagements.

Chief Monroe continues his police reform efforts by partnering with noted professional organizations providing consulting services and subject matter expertise in collaborative reform projects, critical incident reviews, violence reduction projects, body worn camera programs, and the handling of mass demonstrations and special events.

He served as Monitor for Department of Justice Federal Consent Decree in Meridian, MS. He currently serves as the Deputy Monitor for the Chicago Police Department's Consent Decree. His focus areas include, Use of Force, Accountability/Transparency, Supervision, Training, Officer Wellness and Safety, and Hiring, Recruitment, and Promotion.

Chief Monroe has served as an Expert for the USDOJ Civil Rights Division in conducting Pattern and Practices investigations in the Louisville Metro Police Department, the Memphis Police Department, the Louisiana State Police, and the Mt. Vernon Police Department.

Additionally, Chief Monroe has provided subject matter expertise on several other projects, including conducting a Racial Bias Audit for the City of Charleston, SC; North Charleston Collaborative Reform; and Minneapolis Critical Incident Review. Chief Monroe served as a Strategic Site Liaison for the Department of Justice, Bureau of Justice Assistance National Public Safety Partnership (PSP), National Body Worn Camera Program, and Safer Neighborhoods through Precision Policing Initiative (SNPPI) TTA programs.



### Natalia M. Delgado | Compliance Evaluator

Attorney Natalia Delgado left private practice in 2009 to begin her career in government, serving as Associate General Counsel with the Office of Illinois Governor Pat Quinn. Delgado had principal responsibility for addressing the legal issues of several State boards and agencies, including the Illinois State Police, Prisoner Review Board, and the Department of Corrections. In addition,

Compliance Evaluator Report | December 2025

Delgado managed Executive Clemency, leading a team reviewing petitions and making recommendations to the Governor, ultimately acting on nearly 5,000 petitions.

Delgado went on to serve as Deputy General Counsel and Chief of Litigation for the Illinois State Police. Her responsibilities included managing the litigation pending against the Department and its officers, prosecuting officers administratively for alleged policy violations, making policy recommendations, drafting proposed legislation, and testifying before the legislature. Delgado also created curriculum and provided training to sworn officers and forensic scientists on various topics including Civil Rights & Civil Liabilities, Responsibilities of Field Training Officers, Search & Seizure, Bias Based Policing and Civil Deposition Preparation. While there, Delgado received a Meritorious Service Medal, awarded for outstanding achievements contributing to the efficiency and effectiveness of the Department.

Delgado next served as Deputy Director of Policy at the Cook County State's Attorney's Office, where she coordinated the planning, development and execution of several new policy and research efforts. Delgado leveraged relationships with law enforcement partners and advocates to educate and train on new initiatives and developed multidisciplinary teams to coordinate investigations and support services.

Delgado went on to serve as City Prosecutor in the City of Chicago, managing the attorneys and department responsible for prosecuting criminal and administrative violations of the Chicago Municipal Code. Delgado's practice also included civil defense of Freedom of Information Act litigation pending against City Departments in circuit court.

Delgado currently serves as General Counsel for the Illinois Commerce Commission, the state agency responsible for overseeing electric, natural gas, telecommunications, water and sewer public utility companies in the state. The Commission employs close to 300 people and operates with an annual budget of approximately 65 million dollars.

Delgado received a Bachelor of Arts Degree from Colgate University and a Juris Doctor from DePaul University School of Law. She is bilingual in Spanish and English.



### Michael Teeter | Compliance Evaluator

Mike Teeter is an educator and career police officer who serves as a police practices expert providing training, consulting, and expert witness services related to leadership, use of force, policy, significant incidents, accountability, human resources, and training. He uses the extensive experience garnered leading force investigations, training, policy development, human resources, and force review boards for the Seattle Police Department during Seattle's reform journey to help other organizations improve and reform their processes, practices, training, and leadership development. The overall goal of Teeter's work is to improve public trust and confidence in law enforcement through meaningful reform, timely and relevant training, solid supervision and effective accountability systems and measures including thorough, objective, and transparent investigations of police actions. In addition to building community trust and confidence, this work is intended to improve professionalism, wellness, and officer safety and ultimately, to reduce force related injuries and deaths recognizing the sanctity of human life.

Teeter rose through the ranks of the Seattle Police Department where he served for nearly 30 years before retiring in 2022 as a Captain. He has a broad range of experience which has prepared him to serve others

as a consultant and expert, and to teach current and aspiring criminal justice professionals. In addition to the assignments noted above, Teeter commanded the Seattle Police West Precinct, leading a team of 200 sworn officers providing front line police services to a daytime population exceeding 260,000 in the heart of Seattle's downtown and tourist core. Other roles he's held in his career include impaired driving enforcement, drug recognition expert (DRE), field training officer (FTO), internal investigations sergeant and lieutenant, patrol sergeant and shift commander, and recruiting/background investigation lieutenant.

Teeter is now serving as the Graduate Program Director for Salve Regina University's online criminal justice and cybersecurity program. He teaches graduate level criminal justice courses, advises students and is responsible for the overall content and quality of this very popular degree program.

In addition to his work at Salve Regina, Teeter's current consulting work includes serving as an expert witness in police deadly force incidents, serving on the Springfield Compliance Evaluator team, and conducting leadership training for the Washington DC Metropolitan Police Department and Washington State police leaders.

Teeter earned two Bachelor of Science Degrees from the University of Washington and a Master of Science Degree from the University of Southern California.

# APPENDIX B

# The Settlement Agreement - Synopsis

The following is a synopsis of the process that led to the Settlement Agreement and this ongoing process:

> On Wednesday, April 13, 2022, the United States Department of Justice Civil Rights Division ("DOJ") and the United States Attorney's Office for the District of Massachusetts ("USAO") filed in U.S. District Court a complaint and proposed consent decree ("Settlement Agreement" or "Agreement") with the City of Springfield, MA (City). This action was the culmination of an investigation, originally launched in April 2018, that concluded the Springfield Police Department's ("SPD") Narcotics Bureau engaged in a pattern or practice of excessive force that deprived individuals of their rights under the Fourth Amendment to the U.S. Constitution.

> The DOJ investigation and subsequent Settlement Agreement focus primarily on the use of excessive force. The comprehensive, sixty-nine-page agreement outlines desired reforms that will improve policies, training and accountability related to SPD officers' use of force. As stated in the press release issued by the Department of Justice on the day of the filing:

>> "The improvements will ensure that officers avoid force whenever possible through the use of de-escalation tactics; that officers know when force can and cannot be used; and that officers report all instances where force is used. In addition, the Springfield Police Department will provide better supervision of officers and improve internal investigations of complaints of officer misconduct. When officers violate use-of-force policies, the agreement will ensure that the Springfield Police Department holds officers accountable."

> The Agreement required the parties to recommend a monitor, known as "Compliance Evaluator," to be appointed by the federal judge overseeing the Agreement, Magistrate Judge Katherine A. Robertson, U.S. District Court, District of Massachusetts. Following a rigorous and competitive process, O'Toole Associates, LLC was ultimately selected for the role and appointed by Judge Robertson on August 1, 2022. Kathleen O'Toole, the company's founder and president, serves as lead compliance evaluator, assisted by Rodney Monroe, Natalia Delgado, and Michael Teeter who serve as deputy compliance evaluators. Collectively, this group is now referred to as the Compliance Evaluator Team ("CET").

> As the objective representative of the Court, the CET is required to assess and report whether the requirements of the Agreement have been met and if implementation is producing the desired result - constitutional and effective policing. The CET also works with the parties to identify any barriers to compliance and provides technical assistance to SPD to overcome such barriers.

> As required in Paragraph 194 of the Agreement, prior to the appointment of the CET, DOJ and the City agreed on a detailed outline of key benchmarks for implementation of the Agreement.

> Under Paragraph 196 of the Agreement, the CET is also required to conduct a review every six months to determine if the city and the SPD have met the requirements of the Agreement. In doing so, the CET considers policies that have been developed and implemented, training in

support of those policies, and measures to ensure the SPD is consistently following and holding its personnel to the requirements of the Settlement Agreement. The review processes include both quantitative and qualitative assessments.