**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br><br>v.<br><br>THE SPRINGFIELD POLICE<br>DEPARTMENT, and CITY OF<br>SPRINGFIELD, MA,<br>        Defendants | No. 3:22-cv-30043 |

**MEMORANDUM OF LAW IN SUPPORT OF
JOINT MOTION TO TERMINATE CONSENT DECREE**

The United States, the Springfield Police Department ("SPD"), and the City of

Springfield (the "City") jointly move for termination of the Settlement Agreement (the

"Agreement") in this case.  On April 29, 2022, the Court entered an order adopting the

Agreement, which requires the City and SPD to ensure constitutional use-of-force practices by

"improving [SPD's] force policies and reporting practices; increasing accountability; providing

officers with appropriate training; and increasing transparency."  The Agreement followed the

United States' investigation of SPD for constitutional violations within SPD's Narcotics Unit.

Since the Agreement, the City and SPD have worked collaboratively with the United States to

implement each requirement of the Agreement, under the supervision of the Court-appointed

Compliance Evaluation Team ("CET").  The CET has issued regular reports apprising the Court

and the public of SPD's progress.

Due to these collective efforts, the CET has concluded that SPD and the City have

satisfied all the terms of the Agreement and that the Agreement should now be terminated.  The

1

United States and the City (together, the "Parties") agree and now jointly request that the Court terminate the Agreement pursuant to Paragraph 242 of the Agreement and Federal Rule of Civil Procedure 60(b)(5).

## I.      BACKGROUND

In April 2018, the United States opened an investigation into SPD pursuant to 34 U.S.C. § 12601.  After a comprehensive investigation, the United States issued a report of its findings on July 8, 2020.[1]  The United States filed its Complaint in this matter on April 13, 2022, with a joint motion, memorandum, and proposed order to adopt a negotiated Settlement Agreement as an order of this Court.  ECF Nos. 1-3.  This Court adopted the Agreement and retained jurisdiction of the case on April 29, 2022 (ECF No. 16), and held a status conference on June 6, 2022, where it adopted a proposed schedule, submitted by the parties, which included multiple further conferences.  ECF No. 23.  These hearings were conducted via video conference and in-person appearances, with access to the hearings made available to both the media and public.  At the August 1, 2022, status conference, the Court appointed the CET and the Lead Compliance Evaluator, Kathleen O'Toole.  ECF Nos. 24 and 25.

The Agreement required SPD to develop and implement use-of-force policies, improve training for officers, and strengthen supervision and accountability.  ECF No. 2-1, Secs. III-IV, VI-VII.  SPD also bolstered its capacity for data collection and analysis, and it implemented policies for the appropriate use of body-worn cameras by officers.  ECF No. 2-1, Sec. V, VIII.

---

[1] A copy of the Report, entitled "Investigation of the Springfield, Massachusetts Police Department's Narcotics Bureau," is attached hereto as Exhibit A.

## II.    LEGAL STANDARD

The Agreement requires the Court to schedule a hearing four years after the effective date of the Order, "to assess the City's overall progress on achieving and maintaining Substantial and Effective Compliance with the decree." Agreement ¶ 247, ECF No. 2-1.  To achieve Compliance with the Agreement, the City may either comply with all "material requirements" of this Agreement or "achieve sustained and continuing improvement in constitutional policing, as demonstrated by the Agreement's outcome measures." *Id.* at ¶ 286.  Compliance with the Agreement's material requirements requires SPD to complete all policies and trainings called for by the Agreement, as confirmed by audits, and for SPD to carry out these changes in actual practice.  *Id*. at ¶ 286.  The Agreement sets forth the outcome measures in Paragraph 197; these are intended to measure whether implementation of the Agreement has resulted in constitutional policing with respect to uses of force within SPD's Firearms Investigation Unit ("FIU").[2] *Id.* at ¶ 197.  The Agreement provides that it will terminate when the City has, for two years, either (1) achieved sustained and continuing improvement in constitutional policing, or (2) complied with all material requirements of the Agreement, such that all policies and trainings have been completed and the changes have been carried out in practice.  ECF No. 2-1  ¶¶ 242, 286.

In addition, Federal Rule of Civil Procedure 60(b)(5) provides that this Court may terminate a decree where "the judgment has been satisfied, released, or discharged," or where "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).  A judgment has been satisfied "when the consent decree's fundamental purpose has been accomplished and any

---

[2] The United States' investigation found a pattern or practice of excessive force by SPD officers within its Narcotics Unit in violation of the Fourth Amendment.  The Narcotics Unit was disbanded in 2019, in a reorganization of SPD redirecting resources to violent crimes involving firearms, leading to the creation of a new division, the FIU.  Aff. of Captain Brian Beliveau ¶¶ 19, 23-24, attached as Ex. B.

deviations from the decree are 'unintentional and so minor or trivial as not substantially to defeat the object which the parties intend[ed] to accomplish.'" *Peery v. City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020) (quoting *Jeff D. v. Otter*, 643 F.3d 278, 284, 288 (9th Cir. 2011)). Courts applying Rule 60(b)(5) look at the totality of the circumstances, including "defendants' efforts to comply with federal law" and "defendants' commitment to remaining in compliance with federal law." *Jackson v. Los Lunas Community Program,* 880 F.3d 1176, 1202-03 (10th Cir. 2018). Based on the facts described below, including reports by the CET, the Parties agree that the City has satisfied the Agreement and respectfully request that the Court enter an order terminating the Agreement.

## III.   ARGUMENT

### A. SPD Has Satisfied the Agreement's Material Requirements and Achieved Continuing Improvement in Constitutional Policing.

The CET has evaluated compliance over the course of the Agreement and has reported on the City's and SPD's compliance twice each year. ECF Nos. 35, 52, 63, 76, 94, 116. The CET has also issued two annual FIU Outcome Assessment Reports related to the Agreement's outcome measures, covering data for the years 2023 and 2024 respectively. ECF Nos. 89, 105.

Pursuant to the terms of the Agreement and working with the CET, SPD implemented comprehensive reforms, including enhanced training programs, revised use-of-force policies, and the establishment of robust accountability mechanisms which encompass the entire Department. For example, the CET reports that SDP has updated policies and delivered "quality training" each year of the Agreement. ECF No. 124 at 5. SDP's use-of-force "reporting and review have improved significantly," and "when concerning incidents do take place and when areas for improvement are identified, supervisors are regularly identifying and directly addressing the concerns." *Id.* at 5. The CET has now concluded that all material requirements of the

Agreement have been satisfied.  The CET's final report focused on twenty-three specific Agreement paragraphs where further progress remained to be made, and which are now in compliance.  *Id.* at 5-8.

Over the course of the CET's reporting, the City has demonstrated sustained and continuing improvement in constitutional policing, including through the two Outcome Assessments published for the years 2023 and 2024.  From 2023 to 2024, the CET reported "a substantial reduction in force."  ECF No. 105 at 5.  During this period, there was also a significant decrease "in the proportion of arrests involving reported force."  FIU 2024 Outcome Assessment at 8.  In both 2023 and 2024, there were no complaints related to FIU operations and no arrests or prosecutions of FIU officers related to incidents in those years.  ECF No. 89-1 at 12; FIU 2024 Outcome Assessment at 13.  In 2025, FIU officers "continued to use relatively low levels of force and to use force infrequently."  ECF No. 124 at 5.  In addition, the CET identified six injuries to subjects in 2024, three of which were "scratches or minor lacerations," and five injuries to subjects in 2025, four of which were "scratches or minor lacerations."  ECF No. 89-1 at 10; FIU 2024 Outcome Assessment at 10.  The CET's final report describes training provided to officers, supervisors, FIU members, and complaint investigators.  ECF No. 124 at 6.  Finally, as to supervision, the CET reports "great progress in supervisory review of force cases," finding that supervisors "are routinely completing [thorough] reviews, identifying issues requiring feedback or counseling and addressing those issues directly."  *Id.* at 6.

The progression of the CET's reports show SPD's consistent and durable improvements over time.  Pursuant to Paragraph 202 of the Agreement, the Parties jointly submitted the Compliance Evaluator's Second Monitoring Report (ECF No. 52-1) on August 3, 2023.  The Compliance Evaluation Team reported:

> [S]ignificant policy changes related to use of force that provide clearer direction to officers.  In-service training that aligns with adult learning principles, including live scenarios, has been developed and delivered to officers and supervisors to guide their actions and test their understanding of the new policies.  Manuals that outline governance, policies and procedures of the Board of Police Commissioners and the Internal Investigations Unit are nearing completion following public comment.  A new Force Investigation Team (FIT) policy and manual are currently being finalized.  An electronic tracking system for officer training is nearing completion.  The City is also developing training for the Board of Police Commissioners.  With input from community stakeholders, the SPD is updating its engagement and information sharing strategy.  Employee wellness programs are being evaluated to ensure personnel who experience psychological and physical trauma related to their stressful work receive quality services.  These developments and other reforms will enhance accountability and underpin a system that is fair to officers and responsive to community members.  As stated in our first report, desired outcomes in this process include "increased professionalism, enhanced public trust, improvements in police morale, and safer neighborhoods.

*Id.* at 3.

On February 29, 2024, the Parties jointly submitted the CET's Third Monitoring Report. ECF No. 63-1.  This report highlighted the successful creation of the Board of Police Commissioners' ("BOPC") Manual (attached as Exhibit G) and the Internal Investigations Unit ("IIU") Manual (attached as Exhibit H). The report also documented the adoption of two new policies related to peer support and field training as well as the implementation of specific in-service training modules, designed to educate officers and supervisors about new requirements and expectations.

The Third Monitoring Report provided a baseline assessment of Use of Force cases and IIU cases conducted by the CET and the United States.  During these first reviews, the CET and the United States identified isolated areas requiring further attention when appropriate to inform corrective action, training, and discipline.  The CET engaged with community members and local organizations and reported observations of many members of the SPD making authentic efforts to improve community relationships.

6

The CET noted it had been "heartening to attend community meetings and witness this firsthand. We're particularly pleased about the collaborative effort underway between the SPD and community leaders to develop a data dashboard that will enhance transparency and readily provide important information to community members." *Id.* at 3. The report also states:

> It is important to acknowledge that this is a rigorous process. Nonetheless, the CET encourages the parties to increase momentum to meet deadlines, but certainly at a pace that ensures reforms are implemented properly and lead to desired outcomes and sustainability. Both parties have dedicated substantial resources to the effort. We understand SPD is again expanding the Settlement Agreement Implementation Unit to promote greater accountability and effective training. We genuinely appreciate the commitment and work ethic of all who are progressing this effort.

*Id*.

The CET's August 2024 Fourth Compliance Evaluator Report (ECF. No. 76-1) documented the transition of authority to newly appointed Superintendent Lawrence Akers and City Solicitor Steven Buoniconti, noting that both leaders embraced the reform process and demonstrated commitment to its success. *Id.* at 3. During this transition period, revised policies establishing guidelines for field training, peer-to-peer support, and promotions were formally approved and integrated into the department's operational framework. *Id.* at 5.

The CET's Fifth Report, filed April 2025, ECF No. 94-1, confirmed the impact of these reforms. Following a comprehensive audit of 2024 incidents, the CET concluded that the SPD had successfully achieved compliance with approximately two-thirds of the Agreement's provisions directly related to Use of Force. *Id.* at 7. The qualitative metrics within the department reflected a cultural shift in supervisory accountability. *Id.* at 11.

In 2024, investigating supervisors responded to the scene of force applications 85% of the time, consistently conducting thorough reviews that included locating private video, interviewing witnesses, and ensuring proper scene documentation. The newly established Use of Force

Committee became fully operational in the fourth quarter of 2024, reviewing force incidents to identify tactical issues, policy adherence, and ongoing training opportunities.  Objective data demonstrated that in 2024, SPD officers responded to 141,598 calls for service.  Out of these interactions, there were 329 use of force events—the vast majority of which (234 incidents) involved only "Level 2" force, the lowest reportable category.  The CET has explicitly recognized that this measurable progress is a direct result of the collaborative leadership of Superintendent Akers, the Professional Standards Unit, and the department-wide adoption of these new standards.  ECF No. 105 at 3.

Throughout 2025, the Court maintained active and consistent oversight of the Agreement through a series of regular status conferences held on February 26, May 14, August 20, and November 19.  ECF No. 87.  Prior to the first of these 2025 conferences, on February 25, the Parties submitted the CET's FIU Outcome Assessment.  ECF No. 89-1.  This assessment evaluated the operational and structural reforms within the FIU.  The CET's Fifth Monitoring Report informed the subsequent May 14 status conference and documented SPD's ongoing integration of updated policies and training.  ECF Nos. 94-1, 100.

On December 23, 2025, the CET filed a specialized assessment in which the CET shifted its focus from comprehensive departmental reviews to the small number of areas remaining to achieve full compliance with the Agreement.  ECF No. 116.  Highlighting the City's sustained compliance, the CET emphasized:

> As in each of our previous assessments, I want to begin by acknowledging the sustained effort, cooperation, and commitment demonstrated by City leadership, the Springfield Police Department ("SPD"), and the many personnel who have remained deeply engaged in this reform process.  Over the course of our work together, we have consistently noted the City's earnest approach to meeting the obligations of the Agreement and its willingness to adapt, improve, and invest in long-term change. . . .

This report departs in structure and purpose from prior iterations. With the April 2026 target for completion approaching, this assessment is designed to provide a sharper, more focused lens on the specific requirements that remain outstanding. While previous reports documented progress comprehensively, this edition concentrates almost exclusively on those provisions where work is still required. Our intention is to offer the City and SPD a clear, concise, and practical roadmap for completing all remaining obligations within the timeframe originally envisioned.

The Settlement Agreement is a lengthy document containing 293 paragraphs. In this report, the CET focuses on the twenty-one paragraphs that we believe require additional attention of the parties between now and April 2026. By narrowing our focus in this manner, we aim to ensure that leadership has the benefit of direct, actionable guidance and that the final months of implementation are organized around well-defined, achievable objectives. The City has demonstrated repeatedly that it possesses both the capacity and the commitment to finish this work.

*Id.* at 9.

This report, and more specifically, the twenty-one paragraphs identified by the CET as requiring additional attention, *Id.*, served as a roadmap for SPD between December 2025 and now.

The IIU operates a structured audit system supported by the Quality Assurance Division, which conducts quarterly reviews of completed investigations and automatically includes high-risk cases. These IIU audits evaluate the objective reasonableness of force, investigative completeness, evidence collection, Garrity protections, and legal and policy adherence. A Quality Assurance Audit Board, overseen by an attorney designated by the City Solicitor, reviews the IIU audit findings to conduct pattern and trend analyses, identifying recurring deficiencies and emerging risks before they become systemic, and issues quarterly reports. Going forward, additional members of the Audit Board will include Division Commanders within the SPD Professional Standards Unit, the Quality Assurance Commander, the Training Division, the IIU Commander, and the SPD Accreditation Manager. (KTB Aff. ¶¶ 45-46). The CET "has seen substantial improvement in the thoroughness of IIU investigations." ECF No. 124 at 6.

9

The CET filed its final report on April 27, 2026. *Id.* The CET reported that throughout the course of the Agreement, "Use of Force policies have been revised on a regular basis, quality training has been designed and offered each year, and reporting and review have improved significantly." *Id.* at 5. Overall, SPD has implemented a thorough and multi-level review process when uses of force occur, that, "together with ongoing training and other actions SPD and the City have taken, [is] helping SPD engage in professional law enforcement in a manner that is Constitutional and lawful." *Id.* Focusing on the FIU, the focus of the United States' investigation in this matter, CET found that in 2025 "FIU personnel continued to use relatively low levels of force and to use force infrequently." *Id.* The CET identified only one force application that was "notable" in its review of 2025 uses of force, "resulting in minor abrasions to the armed subject." *Id.* Importantly, "[t]he CET found that FIU supervisors and commanders are now routinely reviewing force applications thoroughly, identifying any areas that need to be addressed or that could be improved, and taking action to address identified issues." *Id.* With respect to investigation and review of force incidents, the CET observed "great progress in supervisory review of force cases" in which supervisors are routinely acting in accordance with the Agreement's requirements. *Id.* at 6.

With respect to de-escalation, the CET "noted several good examples of deescalation and intervention" in its audits. *Id.* at 5. The CET also observed that in those incidents where an FIU officer escalated the situation inappropriately, SPD supervisors identified those incidents and took action to address concerns appropriately, resulting in "substantial improvement in subsequent incidents." *Id.*

The CET's final report highlights that "data and examples contained in this report— together with the progression documented in earlier reporting periods—demonstrate that SPD

has not only met the material requirements of the Agreement but has also achieved sustained and continuing improvement in key areas of constitutional policing." *Id.* With no additional areas to address, the CET report shows that SPD has satisfied the Agreement.

**B. SPD's Oversight Systems Ensure That Reform Will Endure Without Court Involvement.**

The CET has concluded that SPD and the City are well-positioned to ensure that the reforms implemented under the Agreement will continue. *See Id.* at 8. For example, in the final report, the CET states that the "work undertaken here reflects not only compliance with specific provisions, but a broader commitment to Constitutional, professional, and community-centered policing. We are confident that the systems now in place, coupled with the City's commitment to sustainment, will support continued success and improvement beyond the term of this Agreement." *Id.* at 4.

SPD's Professional Standards Unit ("PSU") functions as the SPD's permanent monitor ensuring continuous oversight of departmental compliance. Assuming the responsibilities of the Settlement Agreement Implementation Unit, SPD designed the PSU to sustain reforms after the termination of the Agreement. *See id.* (noting that PSU "will continue to play a central role in maintaining accountability and operational integrity"). The PSU serves as a check on the traditional chain of command by conducting a tertiary and final review of every single use-of-force report filed by an officer. During this process, PSU auditors cross-reference officer reports against body worn camera footage to independently identify discrepancies. Beliveau Aff. ¶¶ 16, 19-21.

Beyond routine auditing, the PSU possesses authority to enforce accountability and drive systemic self-correction. If the unit identifies concerning conduct or training gaps during its reviews, it can bypass the standard chain of command and refer cases directly to the Police

Superintendent for executive action or to the Training Academy for mandatory retraining. Beliveau Aff. ¶¶ 21-22. Furthermore, the PSU acts as the central hub for the department's data management and transparency initiatives. It analyzes use-of-force data and produces semi-annual public reports.

Complementing this internal monitoring by the Professional Standards Unit, the Springfield BOPC serves as the civilian oversight mechanism to sustain constitutional policing. *See* ECF No. 124 at 8; *and* Breck Aff. ¶¶ 28-29. The City chose to appoint the five-member BOPC as an independent check on significant police disciplinary matters. *Id.* The City empowered the Board with final authority to conduct hearings and impose discipline for serious misconduct. Breck Aff. ¶ 35. The Board's authority and operating procedures are formally codified in a comprehensive manual that establishes evidentiary standards and a standardized disciplinary matrix. *Id.* at ¶ 36. The BOPC mandates specialized training for its commissioners and consistently publishes the anonymized outcomes of completed disciplinary hearings on a public-facing website to show accountability in action.

Oversight of SPD is not limited to the City's internal mechanisms. Chapter 253 of the Acts of 2020, An Act Relative to Justice, Equity and Accountability in Law Enforcement in the Commonwealth, established the Peace Officer Standards & Training ("POST") Commission as an independent state agency with the power to certify, discipline, and decertify all law enforcement officers in Massachusetts. *See* G.L. c. 6E. This legislation moved policing from a localized employment model to a state-licensed profession. *Id.* The regulations promulgated by the POST Commission mirror the core requirements of the Agreement, effectively embedding these requirements into state administrative law. *See* 555 C.M.R. 6.00 *et. seq.*

The substantive overlap between the Agreement and state law means that SPD must continue to comport with core Agreement provisions without Court involvement. For example, the POST regulations restrict the use of force to instances where it is "necessary and proportionate." 555 CMR 6.00. This standard is even more stringent than the Agreement's requirement that force be objectively reasonable and be consistent with the Fourth Amendment. ECF No. 2-1, ¶ 282. Similarly, POST regulations that mandate that an officer must intervene when witnessing excessive force overlap directly with the requirements of the Agreement. 555 CMR 6.06; ECF No. 2-1, ¶ 31. To enforce its statutory authority, the POST Commission has the power to revoke an officer's certification for serious misconduct, including excessive force, bias, and dishonesty. 555 CMR 1.00. This decertification mechanism provides a permanent state-level safeguard for removing problematic officers that exists independent of the SPD's internal disciplinary process or collective bargaining agreements. *Id.* Additionally, some policy changes mandated by the Agreement have become state law. *See, e.g.*, 555 CMR 6.00 (banning chokeholds and requiring de-escalation measures); ECF No. 2-1, ¶ 25 (requiring the City to adopt a ban on chokeholds).

Based on the record in this case and steps taken over the last several years, the CET concludes that the City and SPD have demonstrated "a meaningful and credible commitment to sustaining reform." ECF No. 124 at 8. The Parties agree and accordingly request that the Court terminate the Agreement.

IV.    **CONCLUSION**

For the reasons stated above, the Parties respectfully request that this Court GRANT the Joint Motion and TERMINATE the Agreement.

13

Respectfully submitted,

**CITY OF SPRINGFIELD AND SPRINGFIELD POLICE DEPARTMENT**

By their Attorneys

/s/ Stephen Buoniconti
_____

Stephen Buoniconti, Esq. BBO#:
City of Springfield, Law Department
36 Court Street, 2nd Floor
Springfield, MA 01103
sbuoniconti@springfieldcityhall.com(413)
787-6085 (tel)
(413) 787-6173 (fax)

/s/ Devon Grierson
_____

Devon Grierson, Esq. BBO#:
City of Springfield, Law Department
36 Court Street, 2nd Floor
Springfield, MA 01103
dgrierson@springfieldcityhall.com
(413) 787-6085 (tel)
(413) 787-6173 (fax)

/s/ Edward M. Pikula
_____

EDWARD M. PIKULA, BBO #399770
edward.pikula@outlook.com
Law Offices of Edward M. Pikula
1441Main Street – Suite 900
Springfield, MA 01103
Phone: (413) 531-5004
Fax: (413) 294-1079

**THE UNITED STATES**

HARMEET K. DHILLON
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

LEAH B. FOLEY
UNITED STATES ATTORNEY

By:

/s/ Gregory J. Dorchak
GREGORY J. DORCHAK
MA BBO 692246
Assistant United States Attorney
United States Attorney's Office
300 State Street, Suite 230
Springfield, MA 01105
(413) 785-0291
Gregory.Dorchak@usdoj.gov

R. JONAS A. GEISSLER
Deputy Assistant Attorney General
Civil Rights Division

PATRICK MCCARTHY
Acting Chief
Special Litigation Section
Civil Rights Division

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the within was served upon the Plaintiff and all parties via the Federal Court's ECF Notice and Delivery System. I am not aware of any party who is a non-registered participant, and therefore electronic filing is the sole means of service of this document.

/s/ Gregory J. Dorchak
Gregory J. Dorchak